SARAH H. GRINDSTAFF, Plaintiff v. MICHELLE GRINDSTAFF BYERS and
JONATHAN DEWAYNE BYERS, Defendants

No. COA01-803

(Filed 20 August 2002)

1. **Child Support, Custody, and Visitation— custody—standing—grandparent—motion to dismiss**

    The trial court did not err by concluding that plaintiff maternal grandmother had standing to initiate an action for child custody on 28 February 2000 and by denying defendant father's Rule 12(b)(6) motion to dismiss, because: (1) grandparents alleging unfitness of their grandchildren's parents have a right to bring an initial suit for custody even if there is no ongoing custody proceeding; and (2) the allegations, including that defendant parents have not visited with the minor children on a regular basis and

that defendants have not shown they are capable of meeting the needs of the children, state a claim upon which relief can be granted.

**2. Child Support, Custody, and Visitation— custody—grandparent—best interest of child**

The trial court erred in a child custody case by performing a best interest of the child analysis between defendant father and plaintiff maternal grandmother and by granting plaintiff custody of the children based on the erroneous conclusion that defendant father acted inconsistently with his constitutionally protected status, because: (1) the trial court did not find that defendant abandoned his children, was unfit, or neglected the children; (2) it is inconsistent to grant the natural father full, free, and regular visitation and then conclude that he has acted inconsistently with his constitutionally protected status as a parent so as to forfeit that status; (3) there is no evidence to support the conclusions that defendant failed to be involved on a daily basis with the children or that he failed in his responsibilities and obligations of parenthood; (4) the record shows that the custody agreement leaving the children in the primary care of plaintiff maternal grandmother was temporary; (5) defendant maintained or attempted to maintain contact and support for his children, and he resumed custody when his circumstances permitted; (6) defendant voluntarily relinquished custody of the children to plaintiff since he believed at that time the interest of the minor children would be best served by placement with their grandmother, showing he put his children's interest ahead of his own; (7) defendant supported his children emotionally and financially despite the mother questioning defendant's fatherhood and plaintiff's refusing defendant visitation; and (8) the fact that a third party is able to offer the minor children a higher standard of living does not overcome a natural parent's paramount interest in the custody and control of the children.

Judge THOMAS dissenting.

Appeal by defendant from a final custody order entered 15 September 2000 by Judge Rebecca B. Knight in Buncombe County District Court. Heard in the Court of Appeals 18 April 2002.

*Ingrid Friesen, P.A., by Ingrid Friesen, for plaintiff-appellee.*

*Richard L. McClerin for defendant-appellant.*

GRINDSTAFF v. BYERS

[152 N.C. App. 288 (2002)]

TYSON, Judge.

## I. Facts

In the fall of 1991, Jonathan Dewayne Byers ("defendant") and defendant Michelle Grindstaff Byers ("Michelle") engaged in a sexual relationship. Taylor Carrington Byers was born 17 September 1992 as a result. Defendant and Michelle married in November 1994. Tyson Christianson Byers was born of the marriage on 22 February 1997. Defendant and Michelle separated on or about 10 October 1998 and divorced on 21 December 1998.

Defendant and Michelle had a tumultuous relationship and marriage. In December of 1998, Michelle left defendant and moved into her mother's, Sarah G. Grindstaff's ("plaintiff"), home with both children. Michelle and the children subsequently moved into a mobile home, provided by plaintiff, in January 1999. The children visited plaintiff regularly between January 1999 and March 1999. Michelle moved into an apartment in April of 1999. Michelle and plaintiff agreed that the apartment was unsuitable for the children. The children stayed with plaintiff in her home. Michelle would call and visit. Defendant presented evidence that Michelle denied him access to the children from October 1998 through February 1999.

Defendant, Michelle, and plaintiff voluntarily executed a Custody Agreement and Power of Attorney ("Custody Agreement") on 18 May 1999. The Custody Agreement placed full care and custody of the children with plaintiff. At that time, defendant was working two jobs and did not have adequate room for the children. Michelle continued to live in an apartment unsuitable for the children.

The Custody Agreement: (1) stated that "the action of Mother and Father in performance of this agreement is not an act of abandonment of the minor children but rather demonstrates their desire to secure the best possible environment for the raising of the minor children," (2) provided a visitation schedule for defendant and Michelle, and (3) required defendant and Michelle to voluntarily enter into a child support agreement, the amount to be determined by the Buncombe County Child Support Enforcement Agency ("Enforcement Agency").

In June of 1999, defendant transferred with his employer to Mecklenburg County, North Carolina and moved into his parent's home located in Charlotte. The Enforcement Agency contacted defendant concerning child support payments. Defendant requested

DNA blood group testing as a condition before he would continue to pay child support. Defendant testified that Michelle had informed him that he was not the biological father of the children. The Enforcement Agency filed a complaint to recover child support ("Child Support Complaint") from defendant on 7 October 1999. Defendant filed a motion on 3 January 2000 requesting DNA testing. As a result of his DNA request, defendant's relationship with plaintiff became strained.

Defendant visited the children on 26 February 2000 with plaintiff's permission and transported the children back to Charlotte. Defendant called plaintiff that evening and informed her that he would not be returning the children to her. On 27 February 2000, defendant caused plaintiff to be served with a "Revocation of Power of Attorney" and "Revocation of Special Power of Attorney."

Plaintiff filed a verified complaint against defendant and Michelle on 28 February 2000 asking the trial court "to determine custody of the minor children . . . [p]ursuant to N.C.G.S. § 50A-204." That same day the trial court issued an *ex-parte* "Order for Immediate Custody" ("*Ex-parte* Order") granting plaintiff "immediate and temporary custody" pending a return hearing on all custody issues. The *Ex-parte* Order authorized law enforcement officials to "assist the Plaintiff in regaining the physical custody of the minor children."

Defendant filed a verified answer, counterclaims, and a motion to dismiss on 6 March 2000. The answer admitted that the trial court had jurisdiction to determine custody of the minor children pursuant to G.S. §§ 50-13.2 and 50A-201, but denied that the trial court had jurisdiction to determine custody pursuant to 50A-204.

Defendant counterclaimed for "immediate and temporary and permanent physical and legal custody of the minor children." Defendant moved to dismiss plaintiff's complaint pursuant to Rule 12(b)(6).

A hearing for temporary custody was conducted on 6 March 2000. Defendant's 12(b)(6) motion was denied and the trial court filed a "Temporary Order for Custody/Visitation and Child Support" on 19 April 2000 ("Temporary Order"). The Temporary Order (1) consolidated the prior Enforcement Agency's child support action, (2) concluded that defendant was "a fit and proper person to have liberal visitation with his minor children and that it is in the best interest of the children that an Order issue granting the defendant liberal visita-

tion with the minor children," (3) ordered that defendant and plaintiff have "temporary shared custody of the minor children with the children's primary residence being with plaintiff Sarah Grindstaff," (4) ordered defendant to pay $411.00 per month child support, (5) ordered defendant liberal visitation establishing a "minimum visitation" schedule, and (6) retained jurisdiction over the parties "for purposes of modification and/or enforcement of this Order." Plaintiff filed a reply to defendant's counterclaim on 4 April 2000.

A custody trial was held in August of 2000. The trial court entered a final Custody Order ("Final Order") making extensive findings of fact and conclusions of law and ordered that the "minor children . . . shall remain in the legal custody of Sarah Grindstaff." The Final Order granted defendant and Michelle visitation, and ordered them to "pay child support as heretofore ordered by the Court." Michelle, the children's mother, filed no pleadings with the trial court and does not appeal. Defendant appeals. We reverse the trial court's order and remand.

## II. Issues

Defendant assigns as error the trial court's (1) failure to grant his Rule 12(b)(6) motion to dismiss and (2) applying the best interest of the child standard when the evidence would not support a determination that he had acted inconsistently with his constitutionally protected status as natural parent.

## III. Plaintiff's Standing

[1] Defendant contends that plaintiff had no standing to initiate an action for custody on February 28, 2000 because no custody proceeding was ongoing and the minor children were in an "in-tact" family, and that plaintiff's claims were fatally defective warranting a Rule 12(b)(6) motion to dismiss. We disagree.

G.S. 50-13.1(a) states that:

Any parent, relative, or other person, agency, organization or institution claiming the right to custody of a minor child may institute an action or proceeding for the custody of such child . . . .

N.C. Gen. Stat. § 50-13.1(a) (2001). Our court previously held that grandparents alleging unfitness of their grandchildren's parents have a right to bring an initial suit for custody, even if there is no ongoing custody proceeding. *Sharp v. Sharp*, 124 N.C. App. 357, 360-61, 477

S.E.2d 258, 260 (1996). G.S. 50-13.1, "is intended to cover 'a myriad of situations in which custody disputes are involved' and its application is not 'restricted to custody disputes involved in separation or divorce." *Id.* at 361, 477 S.E.2d at 260 (quoting *Oxendine v. Catawba Cty. Dept. of Social Services*, 303 N.C. 699, 706-07, 281 S.E.2d 370, 374-75 (1981)). We hold that plaintiff as grandmother of the children had standing to bring an action for custody.

"Although grandparents have the right to bring an initial suit for custody, they must still overcome the 'constitutionally-protected paramount right of parents to custody, care, and control of their children.'" *Sharp*, 124 N.C. App. at 361, 477 S.E.2d at 260 (quoting *Petersen v. Rogers*, 337 N.C. 397, 403-04, 445 S.E.2d 901, 905) (held that "absent a finding that parents (i) are unfit or (ii) have neglected the welfare of their children, the constitutionally-protected paramount right of parents to custody, care, and control of their children must prevail"). "While the best interest of the child standard would apply in custody disputes between two parents, in a dispute between parents and grandparents there must first be a finding that the parent is unfit." *Sharp*, 124 N.C. App. at 361, 477 S.E.2d at 260 (citing *Petersen*, 337 N.C. at 401-02, 445 S.E.2d at 903-04).

Plaintiff's complaint alleged in pertinent part that:

1. The Defendants have visited with the minor children but not on a regular and consistent schedule.

2. The Defendant have been [sic] preoccupied with their own lives and have not shown that they are capable of meeting the needs of the children for care and supervision.

When these allegations are viewed in the light most favorable to plaintiff and granting plaintiff the benefit of every reasonable inference, these allegations state a claim upon which relief could be granted. The trial court did not err by not granting defendant's Rule 12(b)(6) motion to dismiss. This assignment of error is overruled.

## IV. Best Interest Analysis

[2] Defendant contends that the trial court's findings of fact do not support the legal conclusion that he acted inconsistently with his constitutionally protected status, and argues it was error for the trial court to perform a "best interest" of the child analysis. We agree.

The trial court concluded that:

> The custody agreement entered into by the parties specifies that the parents were not abandoning the children by allowing them to live in the home of Sarah Grindstaff. The court concludes as a matter of law that it was not abandonment. . . . [and] the parents [sic] conduct was not neglect or abandonment . . . .

The trial court then concluded however that:

> The parents have acted inconsistently with respect to their constitutionally protected right with regard to their children and therefore the appropriate standard for this Court in determining the issues of custody and visitation are "the best interest" of the minor children in light of all the facts and all the circumstances.

The trial court made extensive findings of fact in support of this conclusion. After thorough review, none of these findings of fact support the legal conclusion that defendant has acted inconsistently with his constitutionally protected status as natural parent of the children. The trial court did not find that defendant (1) abandoned his children, (2) was unfit, or (3) neglected the children.

The Temporary Custody order concluded that defendant "is a fit and proper person" and ordered that defendant and plaintiff share "temporary custody." *See Raynor v. Odom,* 124 N.C. App. 724, 478 S.E.2d 655 (1996) (held that trial court did not err in considering temporary custody orders in determining the issue of child custody).

The trial court's Final Order found that (1) "[o]nce in Charlotte [with defendant], the visitations that have occurred have gone reasonably well and the children have been engaging with various family members," (2) defendant is a reliable employee, (3) defendant has an excellent reputation at work, and (4) that defendant voluntarily placed the children in the home of plaintiff when he was unable to properly provide for them.

There is no evidence in the record showing that defendant acted inconsistently with his constitutionally protected status as the natural father. In its Temporary Order, the trial court concluded defendant was "a fit and proper person to have liberal visitation and that it is in the best interest of the children that an Order issue granting the defendant liberal visitation with the minor children" and awarded him "temporary shared custody of the minor children. . . ." with plaintiff. In its Final Order, the trial court granted defendant

regular visitation. It is inconsistent to grant the natural father full, free, and regular visitation and then conclude that he has acted inconsistently with his constitutionally protected status as a parent so as to forfeit that status.

While there may be evidence to support the trial court's conclusions of law that defendant "willfully and intentionally left the children in the primary care of plaintiff," there is no evidence to support the conclusions that defendant "failed to be involved on a daily basis with the children," or that he "failed in [his] responsibilities and obligations of parenthood."

The conclusion that defendant "willfully and intentionally left the children in the primary care of plaintiff," under the facts of this case, is not sufficient to overcome defendant's constitutionally protected status.

Our Supreme Court has stated that:

there are circumstances where the responsibility of a parent to act in the best interest of his or her child would require a temporary relinquishment of custody, such as under a foster-parent agreement or during a period of service in the military, a period of poor health, or a search for employment. However, to preserve the constitutional protection of parental interests in such a situation, the parent should notify the custodian upon relinquishment of custody that the relinquishment is temporary, and the parent should avoid conduct inconsistent with the protected parental interests.

*Price v. Howard*, 346 N.C. 68, 83-84, 484 S.E.2d 528, 537 (1997).

"[I]f defendant and plaintiff agreed that plaintiff would have custody of the child only for a temporary period of time and defendant sought custody at the end of that period, she would still enjoy a constitutionally protected status absent other conduct inconsistent with that status." *Price*, 346 N.C. at 83, 484 S.E.2d at 537 (citing *Smith v. Organization of Foster Families*, 431 U.S. 816, 53 L. Ed. 2d 14 (holding that natural parents could not lose parental rights to foster parents where the foster agreement contemplates a surrender of custody for only a temporary period of time)).

The trial court did not make any finding of fact whether the Custody Agreement was temporary or permanent. The dissent states that "[w]hile the trial court did not find abandonment . . . such an

agreement [the voluntary custody agreement] in itself fails to establish that there was no abandonment as a matter of law. Determination of abandonment is a factual issue which the court must make based upon the evidence presented at trial." The trial court expressly found however that defendant did not "abandon" or "neglect" the children by executing the Custody Agreement, and that "[t]here was no specified time that the children would remain in the custody of [plaintiff]." The trial court found that

> [t]he parties understood and agreed that this arrangement was due to the fact that neither parent was capable of providing for the children in a suitable manner at that time. The father did not have adequate space for the children and his work hours were such that he would not be available to take care of the children.

Evidence exists in the record to show that the Custody Agreement was temporary. Defendant testified that it was his intent that the agreement was temporary. Michelle also testified that she thought the agreement was temporary. Plaintiff recognized the temporary nature of the agreement. In her complaint, plaintiff stated that she "does not intend to exclude the Defendants from having custody of the minor children at some time." The trial court's Final Order excluded defendant from having custody.

Plaintiff argues that defendant had:

> no employment obligation to fulfill, no illness to overcome, and no task to complete. The parents surrendered the child with no clear justification for doing so, and no identifiable event would bring the parents to a state of readiness to have the children in their custody again. The parents merely resigned themselves to the belief that the children were better off with Sarah Grindstaff. This in not a situation worthy of the protection as contemplated by the *Price* court.

We disagree.

*Price* is not as narrow as plaintiff urges. The list of circumstances enumerated in *Price* is not exhaustive. "Such conduct would, of course, need to be viewed on a case-by-case basis, but may include failure to maintain personal contact with the child or failure to resume custody when able." *Price*, 346 N.C. at 83-84, 484 S.E.2d at 537.

Here, the evidence showed that defendant maintained or attempted to maintain contact and support for his children, and that he resumed custody when his circumstances permitted. Defendant voluntarily relinquished custody of the children to the plaintiff because he believed at that time "the interest of [the] minor children would be best served by placement with Grandmother." This act shows that defendant put his children's interest ahead of his own. Defendant should not be penalized for this action when he requests the return of his children only nine months later after he is more established and settled. The Custody Agreement was executed on 18 May 1999. Defendant revoked plaintiff's power of attorney and special power of attorney on 27 February 2000. Moreover, there is evidence in the record that defendant began to request full custody and return of his children in June of 1999. Defendant testified that plaintiff told him that he could not resume custody of his children until they were eleven or twelve-years-old.

The dissent emphasizes the trial court's findings of fact that defendant (1) "did precious little to visit the children for months at a time," (2) refused to enter into the voluntary support agreement, and (3) requested "paternity tests."

The evidence at trial showed that plaintiff refused to allow defendant visits with the children. Defendant's attorney, Carol Goins ("Goins") testified that defendant told her in late 1999 or early 2000 that defendant could not visit the children because plaintiff "wouldn't allow the visits." Plaintiff refused defendant visitation with his children because defendant requested a paternity test. Defendant requested a paternity test because Michelle told defendant that he was not the biological father of the children on many occasions solely for spite. Defendant's request was not unreasonable under the circumstances, nor did it constitute action inconsistent with his constitutionally protected status. There is overwhelming evidence in the record that defendant supported his children emotionally and financially, despite Michelle's questioning defendant's fatherhood, and plaintiff's refusing defendant visitation.

Defendant testified that (1) after defendant and Michelle separated, Michelle refused defendant visitation, (2) defendant supported the children financially, (3) defendant had regular visitation with the children through June 1999 when they were living with plaintiff, (4) defendant accompanied the children to the doctor and dentist, (5) defendant paid $3,017.50 for day care during 1999, (6) defendant maintained health insurance for the children and helped with their

lunch money, clothing and medical expenses, (7) even when plaintiff refused to allow defendant to visit the children after he requested a paternity test, defendant continued to call the children regularly, (8) defendant requested return of the children in June of 1999, and plaintiff refused, (9) defendant wrote letters, sent gifts, and continued to maintain contact, (10) some letters were returned to defendant unopened, and (11) after defendant requested a paternity test, based on Michelle's revelation that defendant might not be the father of the children, plaintiff became angered and refused defendant visitation after he moved to Charlotte. We hold that there are no findings of fact that support the conclusion, and that there is no evidence in the record, that defendant acted inconsistent with his constitutionally protected status. The trial court erred by performing a "best interest" analysis as between defendant and plaintiff. "The fact that the third party is able to offer the minor child[ren] a higher standard of living does not overcome a natural parent's paramount interest in the custody and control of the child[ren]." *Penland v. Harris*, 135 N.C. App. 359, 362, 520 S.E.2d 105, 107 (1997) (citing *Petersen*, 337 N.C. 397, 445 S.E.2d 901).

Michelle, the children's mother, did not answer the complaint or file a counterclaim seeking custody. Defendant's counterclaim sought permanent custody of the children.

The record contains substantial evidence that plaintiff provided shelter, nurture, love, care and protection for her grandchildren at a time when both parents were unable to provide the children with life's necessities. We applaud plaintiff's actions, and understand the bond that develops between children and their extended family members, and the loss that is felt when daily interaction with the children ceases. Whatever may occur in the future, plaintiff has the singular pride and gratitude of her grandchildren for being there for them when they most needed stability in their lives. Both parents should well remember plaintiff's responsible actions on behalf of their children. Custody orders are subject to review if circumstances change or either natural parent engages in conduct that is inconsistent with their constitutionally protected status. *Sharpe*, 124 N.C. App. 357, 477 S.E.2d 258.

We reverse the order of the trial court granting plaintiff custody of the children and remand for entry of an order granting defendant custody of the children, and a hearing to determine reasonable visitation between plaintiff and Michelle as shall be in the best interests of the children.

**GRINDSTAFF v. BYERS**

[152 N.C. App. 288 (2002)]

Reversed and remanded.

Judge MARTIN concurs.

Judge THOMAS dissents.

THOMAS, Judge, dissenting.

Because there is sufficient evidence for the trial court to find that defendant's actions were inconsistent with his constitutionally protected status as a natural parent, thus properly allowing a "best interest" analysis, I respectfully dissent.

Our Supreme Court has recognized that temporary relinquishment of custody by a parent in the best interest of a child may at times be necessary and does not constitute abandonment by the parent. *Price v. Howard*, 346 N.C. 68, 83-84, 484 S.E.2d 528, 537 (1997). Examples may include foster parent agreements and searches for employment. *Id.* However, the Court further noted that to preserve parental interests, the natural parent must inform the custodian that such custody is temporary and must avoid conduct inconsistent with the protected parental interest. *Id.* This determination is made on a case-by-case basis, but two specific examples of inconsistent conduct cited by the Court include failure to maintain personal contact with the child and failure to resume custody when able. *Id.*

Further, the constitutionally protected rights of a parent are closely connected to the responsibilities of parenthood. *Speagle v. Seitz*, 354 N.C. 525, 530, 557 S.E.2d 83, 86 (2001), *reh'g denied*, 355 N.C. 224, 560 S.E.2d 138, *cert. denied*, —— U.S. ——, —— L. Ed. 2d —— (2002). Failure to undertake such responsibilities may deprive an individual of the protection of parental rights.

> [C]onduct inconsistent with the parent's protected status, which need not rise to the statutory level warranting termination of parental rights . . . would result in application of the "best interest of the child" test without offending the Due Process Clause. Unfitness, neglect, and abandonment clearly constitute conduct inconsistent with the protected status parents may enjoy. Other types of conduct, which must be viewed on a case-by-case basis, can also rise to this level so as to be inconsistent with the protected status of natural parents. Where such conduct is properly found by the trier of fact, based on evidence in the record, cus-

tody should be determined by the "best interest of the child" test mandated by statute.

*Price*, 346 N.C. at 79, 484 S.E.2d at 534-35. Deprivation of personal contact and support by the parent are factors for the trial court's consideration. "It has been held that if a parent withholds his presence, his love, his care, the opportunity to display filial affection, and wilfully neglects to lend support and maintenance, such parent relinquishes all parental claims and abandons the child." *Pratt v. Bishop*, 257 N.C. 486, 501, 126 S.E.2d 597, 608 (1962). Supporting its decision by the evidence in the record, the trial court determines what is inconsistent conduct. "There is no bright line rule to determine what conduct on the part of a natural parent will result in a forfeiture of the constitutionally protected status and trigger application of a 'best interest' analysis." *Penland v. Harris*, 135 N.C. App. 359, 362, 520 S.E.2d 105, 107 (1999). Properly supported findings by the trial court are conclusive in custody cases even where the evidence may appear in conflict.

> [I]n custody cases, the trial court sees the parties in person and listens to all the witnesses. This allows the trial court to "detect tenors, tones and flavors that are lost in the bare printed record read months later by appellate judges." Accordingly, the trial court's findings of fact " 'are conclusive on appeal if there is evidence to support them, even though the evidence might sustain findings to the contrary.' "

*Adams v. Tessener*, 354 N.C. 57, 63, 550 S.E.2d 499, 503 (2001) (citations omitted).

In the present case, the trial court specifically determined that defendant's actions and conduct were inconsistent with the best interests of his minor children. There are findings of domestic violence over the course of many years by defendant in the presence of the children, there are findings that such indefensible conduct emotionally harmed the children. There are findings that defendant was financially able to maintain custody of the children, but chose not to, and findings he could have supported the children while they were with plaintiff, but chose not to. There are findings the children were actually in plaintiff's custody well before any custody agreement, and findings that defendant did precious little to visit the children for months at a time. There are findings that defendant eventually whisked the children to live with him in Charlotte, not only disrupting the children's school and activities without notice or planning but

also without telling his own parents and girlfriend, who were left to supervise them. The trial court's findings of fact include:

8. There were several instances throughout the relationship and marriage of the parties where babysitters or family friends would call the plaintiff . . . to come to the home of [defendant mother and father] in order to pick up [the children], because there were acts of domestic violence and fighting going on between [defendant mother and father] in the presence of the children . . . . [Incidents occurred] in 1993, . . . 1995, [and] . . . 1996 . . . . In September 1998, there was an incident of domestic violence where [defendant father] shoved [defendant mother] and law enforcement was called to the residence. [Defendant father] called the plaintiff, . . . and he told her he had hit [defendant mother] and that [plaintiff] needed to come and pick up [his daughter] . . . . There was an incident described where [the daughter] was hitting [defendant father] with her Barbie doll telling him to let go of her mother, who was pinned up against the wall . . . . In January 1999 there was an incident where the parents got in to [sic] an argument over the telephone. [Defendant mother] testified that [defendant father] made seventy-two telephone calls to her house that evening and came over to the house uninvited and was beating on the door.

9. The domestic violence between the parties began in the Spring of 1992 and continued throughout the relationship and marriage and subsequent to the divorce of the parties. Many of these instances were in the presence of the children and were detrimental to the welfare of the children. The parents were advised by family friends and by their parents to stop the acts of domestic violence. They were encouraged to attend counseling and referrals were made for counseling. The defendant parents did not stop committing acts of domestic violence in the presence of the children.

10. The testimony is overwhelming that the acts of domestic violence had a detrimental effect on the children and that it caused them significant emotional upset in every occasion of domestic violence between their parents in their presence.

11. From 1993 through May of 1999 the time that [the children] would spend with the [plaintiff] increased on a regular basis. The children began to spend more and more overnights in the home of the [plaintiff]. The parents would come to the home to visit the

children or to pick them up for the afternoon or sometimes an overnight visit. By December 1998, the children were living primarily in the home of the [plaintiff] maternal grandmother with the consent of both [defendant] parents. When the parties separated in October of 1998, the [defendant] father moved in with a friend and did not have adequate accommodations for the children. The children did not have overnight visits at that time. In January of 1999, the [defendant] father was unavailable to parent the children on a regular basis . . . . This schedule continued from January 1999 through June 1999.

13. The parties agreed to a custody agreement that was entered on May 18, 1999[.] . . . There was no dispute by either parent that [plaintiff] had been the primary caregiver for a significant period of the children's lives and that the children were well-bonded and comfortable and safe in her home.

14. The Child Support Enforcement Agency did make efforts for the parents to enter into voluntary support agreements contemplated in the custody agreement executed May 18, 1999 . . . . When the father was contacted by the Child Support Enforcement Agency he stated he wanted paternity testing done before he entered into the voluntary support agreement. A complaint was filed by the Buncombe County Child Support Enforcement Agency on October 7, 1999[.] . . . When the issue of paternity was made known to [plaintiff] by the Child Support Enforcement Agency she became very angry with [defendant father]. The plaintiff's statements to [defendant father] were "how could you possibly do this to these children?" . . . The [defendant] father had no visits with the children at all through the fall of 1999. The [defendant] father had telephone contact with the children when he would call the residence but he did not speak to [plaintiff]. Frequently the father spoke to Melanie Grindstaff, the sister of [defendant mother], [who] was in the home during that period of time. Melanie would encourage [defendant father] to talk to [plaintiff] and encouraged him to visit the children but [defendant father] did not do either at that time.

15. In December of 1999, [plaintiff] took [daughter] to a cheerleading competition in Charlotte, North Carolina. [Plaintiff] called Melanie . . . to get the phone number of [defendant father] so that she could invite [him] to visit with [his daughter] while she was at that competition in Charlotte. Melanie contacted [defendant father] and told him where [plaintiff] and [his daughter] were

in Charlotte. [Defendant father] did go to that location and visited [his daughter] and [plaintiff] at the cheerleading competition. [Plaintiff] felt that her presence was creating some tension for [daughter] so she voluntarily left the facility for the afternoon in order to give [daughter] time to visit with her [defendant] father. [Defendant father] had the opportunity to discuss with [plaintiff] resumption of this visitation in Charlotte but he did not do so. [Defendant father] provided no explanation why he had not visited the children in such a long time and there was no discussion about what he would like to do in the future. During the fall of 1999 the relationship between the plaintiff grandmother and [defendant father] was strained because the [plaintiff] grandmother was so upset that the [defendant] father requested paternity testing. However, it was not to the point that it would have interfered in any way with his coming to her home to exercise visitation the way he had in the past. The [defendant] father's conduct in not visiting his children in the fall of 1999 was contrary to the best interest of his children and was inconsistent with his exercise of parental responsibilities and rights.

16. The next time [plaintiff] had any contact from [defendant father] was in February of 2000, when [defendant father] called and indicated he wanted to have visitation the weekend around February 22, 2000, because it was [his son's] birthday. [Plaintiff] told [defendant father] the visitation would be fine but [his daughter] had a national cheerleading competition in Atlanta that weekend. [Plaintiff] asked [defendant father] if he could have his visitation on the following weekend so [his daughter] could participate in the cheerleading competition in Atlanta. [Defendant father] agreed[.] . . . [Defendant father] was living in his parent's home at the time that he picked the children up in February 2000 and took them back to Charlotte. He did not tell his mother or his stepfather that he was going to bring the children back to their home to live with him fulltime. There were no arrangements made in advance for the children to live in the paternal grandparent's home. The children had not visited in that home in a long time. [Defendant father] was dating a woman named Adrian who also lived in Charlotte. From Saturday night, until the following Tuesday when the children were picked up, the children spent part of the time at the paternal grandparent's home and part of the time in Adrian's apartment. At the time the Sheriff's Department picked up the children they were at Adrian's resi-

dence but [defendant father] was not with them. Adrian was not told by [defendant father] after he had picked up the children from the [plaintiff] grandmother that they were returning to Charlotte to live with him. Adrian had no idea of his plans to keep the children in advance . . . . In that the [defendant] father had not exercised any visitation with the children from July of 1999 until February of 2000 (except for the one visit arranged by the [plaintiff] grandmother for the afternoon with [his daughter] in Charlotte in December of 1999) it was very inappropriate and irresponsible of him to take the children without any notice to the children or to the [plaintiff] grandmother or [defendant] mother or his mother or his girlfriend and attempt to relocate the children to Charlotte. This situation caused the children tremendous upset[.] . . . It was more difficult for [his daughter] because she was enrolled in school and there were no arrangements made for her to be enrolled in another school. [His daughter] had her cheerleading activities that were missed. [His daughter] was given no opportunity to make any kind of closure on her life in Buncombe County. The circumstances wherein law enforcement picked the children up from the girlfriends [sic] home when the father wasn't present was also very upsetting to the children and contrary to their best interests. It is the position of [defendant father] that he was their legal father and therefore he had the right to revoke his agreement to place custody with [plaintiff] at any time because he has a paramount right to the custody of his children as their natural parent.

23. Melanie spoke to [defendant father] several times after the paternity issue was raised and told [defendant father] that he needed to be seeing the children and told him specifically "Mom will let you see those kids if you want to."

25. [Defendant mother] acknowledges that [her daughter] began to spend approximately one to two overnights per week when she was an infant with [plaintiff] and that over the years that increased until the children were spending five to six nights[.]

The court also concluded:

4. The issue was not poverty that prevented the parents from parenting full-time because both parents were employed and both parents could have provided an adequate home on the monies that they were earning . . . . While the parents conduct was not neglect or abandonment in the sense that they did not walk away

**GRINDSTAFF v. BYERS**

[152 N.C. App. 288 (2002)]

from their children without making sure they were in a suitable place it was an act inconsistent with their obligation to parent their children and to be involved on a daily basis with the responsibilities and obligations of parenthood.

5. The conduct of the parents and their actions throughout the lives of these children has been inconsistent with their constitutionally protected status[.]

Based on these and other findings, the trial court concluded that both parents willfully and intentionally left the children in the primary care of plaintiff, an act inconsistent with their obligation to parent the children considering the parents' circumstances and abilities. The trial court further concluded that defendants father and mother failed to be involved on a daily basis with the children, and despite their capability to do so, failed in their responsibilities and obligations of parenthood. The findings of fact are more than merely sufficient to support this conclusion by the court. The trial court properly proceeded to determine the children's best interests.

Additionally, much is made of the May 1999 Custody Agreement stating that the agreement did not constitute abandonment by the parents. While the trial court did not find abandonment "in the sense that they did not walk away from their children without making sure they were in a suitable place," it should be emphasized that such an agreement in itself fails to establish there was no abandonment as a matter of law. Determination of abandonment is a factual issue which the trial court must make based upon the evidence presented at trial. A disclaimer by a parent to the effect that granting custody to a third party is not abandonment is insufficient to prevent the trial court from determining that, in fact, the minors had been willfully abandoned by their parents. For example, this Court has held that leaving children in foster care for an extended time period can constitute willful abandonment on the part of the parents, regardless of their good intentions in recognizing that the children were better off in such a situation. *In re Bishop*, 92 N.C. App. 662, 669, 375 S.E.2d 676, 681 (1989). A custody agreement alone cannot be appropriately utilized to show the parents' actions were not inconsistent with their constitutionally protected status, particularly where, as here, the parents actually forfeited custody to plaintiff well before the agreement.

I further dissent as to the majority's award of custody to defendant father. The trial court made the following finding:

25. [Defendant mother] and [plaintiff] agree that [defendant mother's] circumstances have greatly improved and that she is capable of providing care for her children at this time. [Defendant mother] believes that she can provide for her children's care and wants to provide for her children's care but she expressed to the court that her children are in the home where they feel safe, protected, and comfortable and have spent the majority of their life. For that reason, although she wants the children to live with her, she is willing to allow them to stay in the grandmother's home if that is what they want to do. All reports are that when the children are with [defendant mother] and [defendant mother's fiancee] the visitations go well and that there are no problems.

The preceding is not structured as a finding of ultimate facts, but as between the parents, the issue of custody clearly remains viable. Although the mother failed to submit pleadings and, indeed, testified that her mother should have custody, this does not preclude the court's consideration of her as the proper custodian as opposed to defendant father. Under section 50-13.2(a), the court is authorized to award custody to such a "person . . . as will best promote the interest and welfare of the child." N.C. Gen. Stat. § 50-13.2(a) (2001). "In a custody proceeding between two natural parents . . . the trial court must determine custody based on the 'best interest of the child' test." *Adams*, 354 N.C. at 61, 550 S.E.2d at 502.

In *In re Branch*, the paternal grandparents filed for custody of their grandchildren, naming the maternal grandparents and father as respondents. *Branch*, 16 N.C. App. 413, 414, 192 S.E.2d 43, 44 (1972). The petition was answered by the maternal grandparents only. *Id.* The court awarded custody of the children to the respondent father, who had appeared at the custody hearing and was subject to the court's orders. *Id.* at 416, 192 S.E.2d at 45. On appeal, this Court upheld the award, noting, "that the court was fully authorized to award him custody of the children although he had filed no pleading asking for their custody." *Id.*

As with the respondent in *Branch*, the mother here was named as a defendant, appeared and testified at the hearing. She is subject to the orders of the court. As between the two natural parents in this case, the trial court has not yet determined best interests.

Accordingly, I respectfully dissent and vote to affirm the trial court's award of custody to plaintiff.