IN RE A.D.N., A MINOR CHILD

No. COA13-709

Filed 3 December 2013

**1. Termination of Parental Rights—subject matter jurisdiction—standing**

The trial court did not err by concluding that it had subject matter jurisdiction in a termination of parental rights (TPR) case. The evidence supported the trial court's ultimate finding that the minor child resided continuously with petitioner paternal grandmother for the two-year period immediately preceding the filing of the petition. Consequently, petitioner had standing to file the TPR petition under N.C.G.S. § 7B-1103(a)(5).

**2. Appeal and Error—preservation of issues—failure to object—failure to appoint guardian ad litem for minor**

Although respondent mother urged the Court of Appeals to reverse a termination of parental rights order based on the trial court's failure to appoint the minor child a guardian *ad litem*, respondent did not preserve this issue for appeal based on her failure to object at trial. Under the facts of this case, suspension of the appellate rules was not required to prevent manifest injustice to respondent or the minor child.

Appeal by respondent from order entered 1 April 2013 by Judge Peter Mack in Carteret County District Court. Heard in the Court of Appeals 28 October 2013.

*Lauren Vaughan for petitioner-appellee.*

*Richard Croutharmel for respondent-appellant.*

GEER, Judge.

Respondent mother appeals from the trial court's order terminating her parental rights to A.D.N. ("Andy").[1] On appeal, respondent mother argues that the trial court lacked subject matter jurisdiction over the termination of parental rights ("TPR") proceeding because petitioner, Andy's paternal grandmother, lacked standing to file the TPR petition. We hold that the trial court properly concluded that Andy resided with petitioner for a continuous period of two years prior to the filing of the petition, such that petitioner had standing under N.C. Gen. Stat. § 7B-1103(a)(5) (2011). Although respondent mother additionally urges this Court to reverse the TPR order based on the trial court's failure to appoint Andy a guardian ad litem, respondent mother has not preserved her argument on that issue for appeal. We, therefore, affirm the trial court's order.

Facts

Petitioner first met respondent mother in February 2010 when petitioner's son, respondent father, brought respondent mother to petitioner's home in Beaufort, North Carolina in order to introduce respondent mother to petitioner. Petitioner had a strained relationship with respondent father because of his drug use and legal troubles. Two weeks later, respondent mother and father returned to petitioner's home and told her that respondent mother was pregnant.

Respondent mother submitted to a pre-natal examination drug test on 1 September 2010, roughly two and a half months before Andy's birth, and she tested positive for "BZO, oxycodone, and THC." Respondent mother gave birth to Andy on 18 November 2010. At the time of his birth, Andy was diagnosed with neonatal withdrawal syndrome. Respondent mother admitted she used Xanax while pregnant with Andy, although she claimed she had been prescribed Xanax. In the days following Andy's birth, respondent mother requested and was prescribed pain medication for pain from her C-section surgery. She then returned to the emergency room to obtain additional pain medications, telling petitioner that respondent father was "eating her prescriptions like candy."

Andy was released from the hospital on 24 November 2010, and petitioner drove Andy and respondent mother and father to respondent mother's stepfather's house in Carteret County, North Carolina, where respondent mother and father were living. The next day, petitioner

---

1. The pseudonym "Andy" is used throughout this opinion to protect the child's privacy and for ease of reading.

brought Andy and respondent mother and father to petitioner's home for Thanksgiving dinner, and two days later, on 27 November 2010, Andy spent the night at petitioner's home at respondent mother and father's request. Petitioner returned Andy to respondent mother and father the next day.

Beginning at the time of Andy's birth, petitioner kept a daily calendar on which she noted information about Andy, including every time that Andy spent the night in her home. She did so because she worried about her son's drug use and believed it was important to document information about Andy.

Petitioner's calendar showed that from 1 December 2010 onward, Andy spent significantly more nights with petitioner than with respondent mother and father. In December 2010, Andy spent 21 nights in petitioner's home. During January 2011, Andy stayed overnight at petitioner's house for 25 nights. Andy spent 24 nights in petitioner's home in February 2011, and another 26 nights at her home in March 2011. In April 2011, Andy stayed overnight at petitioner's home for 26 nights.

In February 2011, respondent father was incarcerated for breaking and entering. Also in February, while respondent father was in prison, respondent mother moved into her own trailer home. Petitioner provided respondent mother with some furnishings for the trailer. When petitioner picked up Andy from respondent mother's trailer, Andy always smelled strongly of cigarettes. On one occasion, when petitioner picked up Andy from respondent mother, Andy "reeked of stench" and was wearing ill-fitting clothes, requiring petitioner to immediately bathe him and properly dress him.

During this time, a member of respondent mother's family called the Carteret County Department of Social Services ("DSS") and reported an incident in which respondent mother excessively shook Andy because he would not stop crying. DSS then became involved and ordered respondent mother and father to enroll in drug rehabilitation programs and submit to random drug testing. As of 19 May 2011, neither respondent had enrolled in a program, and both had failed numerous random drug tests.

On 19 May 2011, petitioner obtained an ex parte custody order for Andy, pursuant to Chapter 50 of the North Carolina General Statutes, that granted petitioner temporary sole custody of Andy and restricted respondent mother and father from visiting or contacting the child in any way. The order provided that it was in Andy's best interests to be in the sole care of petitioner and that there was probable cause to

believe that the ex parte order was necessary to protect Andy's health, welfare, and safety. A 24 May 2011 modification to the order allowed for supervised visitation by respondent mother and father.

In a 3 November 2011 order, the trial court again granted temporary custody to petitioner, although, this time, it was with the consent of respondent mother and father. Pursuant to the November 2011 order, respondent mother and father were each granted two hours supervised visitation twice a week. Respondent mother and father were both ordered to enroll in a drug treatment and counseling program, submit to random drug tests, and enroll in the Family Adjustment Services program offered by DSS.

Respondent mother visited occasionally, but missed many scheduled visitation periods and rarely stayed for the entire two hour period. Respondent mother was prescribed Suboxin and methadone during this period of supervised visitation to assist in her opiate withdrawal. Respondent mother enrolled in a drug treatment program along with respondent father, but respondent father was dismissed from the program after he and respondent mother attempted to sell respondent mother's Suboxin at a counseling session. Although DSS had required respondents to stop living together and to refrain from drug abuse, they continued to live together and each failed random drug tests during the period of supervised visitation.

On 26 May 2012, after just completing a drug treatment program, respondent mother took three Xanax that she got from a family member and drove to Harlowe, North Carolina to buy cocaine. The day after the Harlow incident, 27 May 2012, respondent mother returned to her trailer and got into a fight with respondent father because he refused to give her money to return to Harlowe and buy more cocaine. Respondent mother hit respondent father, causing respondent father to seek emergency treatment for a severe foot wound. Petitioner visited respondents' trailer the day after the fight and saw lots of blood and bloody rags on the floor, as well as a drug pipe and marijuana on the kitchen counter. In addition, the home was "nasty and dirty."

The trial court entered an order on 8 August 2012 terminating respondents' visitation with Andy. The court found that respondent mother "continues to use and abuse cocaine and other opiates." The August 2012 order further found that respondent mother was evicted from her trailer for failing to pay rent for three months; that the trailer was condemned for health and safety reasons, including the roof partially falling in; and that respondent mother had made "numerous"

threats to petitioner, including a 17 July 2012 threat that she would " 'see [petitioner] in hell for what [petitioner had] done.' "

At a 31 July 2012 hearing, respondent mother advised the trial court that she was going to Arizona to stay with a friend and enroll in a 12-month drug rehabilitation program. Prior to that time, respondent mother had called her friend in Arizona and told the friend that respondent mother was going to kill petitioner, Andy, and herself because "if she couldn't have [Andy], nobody else was going to have [Andy] either." In part because of this call, the friend agreed for respondent mother to stay with her in Arizona and to pay for respondent mother's ticket to Arizona.

Respondent mother left for Arizona on 19 August 2012 and, although she was accepted for an inpatient drug treatment program, she enrolled in an out-patient program. Respondent mother missed classes for the program and did not attend alcoholics anonymous/narcotics anonymous meetings or get a job as required by the program. After two months, respondent mother's friend told respondent mother that she either needed to enroll in an inpatient program in Arizona or return to Carteret County. Respondent mother returned to Carteret County the next day.

After returning to Carteret County, respondent mother did not contact petitioner about Andy, even on Andy's 18 November 2012 birthday. In early December, petitioner received a letter from respondent mother stating that respondent mother was in the process of getting a job and would start sending petitioner $200.00 a month to care for Andy. However, other than a $50.00 check from respondent mother's grandmother and a $30.00 money order from respondent mother, petitioner received no money from respondent mother.

During this time, respondent mother began a romantic relationship with a convicted felon whom she believed, in her own words, to be the "biggest heroin runner in Beaufort." Respondent mother used the man's address, went out of town with him, and kept her belongings at his residence until a 20 February 2013 incident in which the man pointed a gun at respondent mother. On 7 March 2013, respondent mother started living with respondent father at respondent mother's grandmother's home.

On 2 January 2013, petitioner filed a petition to terminate respondent mother's parental rights. At the TPR hearing, respondent mother admitted that she had issues with addiction and that, at the time of the hearing, she was incapable of caring for Andy.

On 1 April 2013, the trial court entered an order finding that it had jurisdiction over the TPR proceeding pursuant to N.C. Gen. Stat.

§ 7B-1103(a)(5) since Andy had resided continuously with petitioner for the two years preceding the filing of the petition. The court further found that grounds existed to terminate respondents' parental rights because (1) respondents left Andy in placement outside their home for more than 12 months without showing reasonable progress in correcting the conditions that led to his removal, (2) Andy was neglected, and (3) Andy was a dependent juvenile and there was no indication that either respondent would be able to care for him within a reasonable period of time. The court then found that termination of both respondents' parental rights was in Andy's best interests and would facilitate Andy's adoption by petitioner and, accordingly, ordered respondents' rights terminated. Respondent mother timely appealed to this Court.[2]

I

[1] Respondent mother first argues that the trial court lacked subject matter jurisdiction over the TPR proceeding because petitioner lacked standing to file the TPR petition. This Court has recognized that "standing is 'jurisdictional in nature and consequently, standing is a threshold issue that must be addressed, and found to exist, before the merits of [the] case are judicially resolved.' " *In re E.T.S.*, 175 N.C. App. 32, 35, 623 S.E.2d 300, 302 (2005) (quoting *In re Miller*, 162 N.C. App. 355, 357, 590 S.E.2d 864, 865 (2004)). Whether petitioner had standing is a legal issue that this Court reviews de novo. *Lee Ray Bergman Real Estate Rentals v. N.C. Fair Hous. Ctr.*, 153 N.C. App. 176, 179, 568 S.E.2d 883, 885 (2002).

Our General Assembly has prescribed by statute who has standing to file a TPR petition. N.C. Gen. Stat. § 7B-1103(a) provides:

> (a)   A petition or motion to terminate the parental rights of either or both parents to his, her, or their minor juvenile may only be filed by one or more of the following:
>
> > (1) Either parent seeking termination of the right of the other parent.
> >
> > (2) Any person who has been judicially appointed as the guardian of the person of the juvenile.
> >
> > (3) Any county department of social services, consolidated county human services agency,

---

2. Although the order also terminated the rights of respondent father, he is not a party to this appeal.

or licensed child-placing agency to whom custody of the juvenile has been given by a court of competent jurisdiction.

(4)  Any county department of social services, consolidated county human services agency, or licensed child-placing agency to which the juvenile has been surrendered for adoption by one of the parents or by the guardian of the person of the juvenile, pursuant to G.S. 48-3-701.

(5)  *Any person with whom the juvenile has resided for a continuous period of two years or more next preceding the filing of the petition or motion.*

(6)  Any guardian ad litem appointed to represent the minor juvenile pursuant to G.S. 7B-601 who has not been relieved of this responsibility.

(7)  Any person who has filed a petition for adoption pursuant to Chapter 48 of the General Statutes.

(Emphasis added.)

The only applicable basis for petitioner to have standing in this case was the ground the trial court concluded existed: N.C. Gen. Stat. § 7B-1103(a)(5). The trial court found that "[t]he minor child has resided continuously with the Petitioner since November 27, 2010." Based on that finding, the court concluded that "[p]ursuant to G.S. 7B-1103(a)(5), the Petitioner has standing to bring the Petition for termination of parental rights, in that the minor child has resided continuously with Petitioner for a period exceeding two (2) years prior to filing the Petition." Respondent mother challenges both this finding and the conclusion based on it.

Since petitioner filed the TPR petition on 2 January 2013, the relevant period – two years preceding the filing of the petition – ran from 2 January 2011 until 1 January 2013. Although respondent mother does not dispute that Andy resided with petitioner continuously after the trial court entered the 19 May 2011 ex parte temporary custody order giving petitioner sole custody of Andy, respondent mother contends that the court erred in finding that Andy continuously resided with petitioner

prior to 19 May 2011. Consequently, we must determine whether the trial court properly determined that Andy continuously resided with petitioner from 2 January 2011 to 19 May 2011.

Initially, we note that while the trial court made the ultimate finding of fact necessary to establish that petitioner had standing, the trial court did not make detailed supporting findings because respondent mother did not raise the issue at trial. The record, however, contains competent evidence supporting the ultimate finding of fact that Andy resided continuously with petitioner for the two-year period prior to the filing of the TPR petition.

Respondent mother first argues that the trial court's conclusion was erroneous because, prior to 19 May 2011, respondent mother had legal custody of Andy and could, therefore, remove Andy from petitioner's home at any point. In applying N.C. Gen. Stat. § 7B-1103(a)(5), this Court has, however, previously held that "[t]he person or persons with whom legal custody lies during [the two-year] time period is irrelevant." *In re E.T.S.*, 175 N.C. App. at 38, 623 S.E.2d at 303. *See also id.* (explaining that "statute confers standing on petitioners based on their two year relationship with the child, which is in no manner related to the respondent or her relationship with the child during that two year period"); *In re B.O.*, 199 N.C. App. 600, 603, 681 S.E.2d 854, 857 (2009) (analyzing whether petitioners, who had temporary custody of child, had standing under N.C. Gen. Stat. § 7B-1103(a)(5) by reviewing time during which child "lived with" petitioners). We are bound by this Court's holding in *In re E.T.S.*

The plain language of N.C. Gen. Stat. § 7B-1103(a)(5) requires (1) that a child have "resided" with the petitioner and (2) that he did so "continuous[ly]" for two years. It is not entirely clear whether respondent mother challenges the trial court's conclusion that Andy "resided" with petitioner from 2 January 2011 to 19 May 2012. Respondent mother's principle brief appears to equate "residing" with overnight stays, thereby implicitly conceding that Andy resided with petitioner between 2 January 2011 and 19 May 2011 on the nights he spent at petitioner's house. Respondent mother then proceeds to argue that because Andy sometimes did not stay with petitioner, Andy did not reside continuously with petitioner. However, respondent mother's reply brief asserts that prior to 19 May 2011, Andy resided with respondent mother but "often spent the night with Petitioner."

Assuming without deciding that respondent mother has argued that Andy did not reside with petitioner, this Court, in analyzing the

requirement that a child reside with a petitioner for the statutory period, has looked to the period of time in which a child "lived with" the petitioner. *See In re B.O.*, 199 N.C. App. at 603, 681 S.E.2d at 857; *In re Ore*, 160 N.C. App. 586, 588, 586 S.E.2d 486, 487 (2003) ("Since the minor child lived with petitioner for the two years next preceding filing the motion, she was a proper person to file the petition."). To determine what the General Assembly intended when requiring that the child "reside" — or, as this Court has held, live with – the petitioner, we look to the analogous context of child support payments.

The General Assembly has directed the Conference of Chief District Judges to create the North Carolina Child Support Guidelines to be used in calculation of child support payments in North Carolina. *See* N.C. Gen. Stat. § 50-13.4(c1) (2011) ("Effective July 1, 1990, the Conference of Chief District Judges shall prescribe uniform statewide presumptive guidelines for the computation of child support obligations of each parent . . . ."). The Child Support Guidelines provide that "[a] parent's presumptive child support obligation . . . must be determined using one of the attached child support worksheets." Form AOC-A-162, Rev. 1/11. With respect to the worksheets, the guidelines provide:

> Use Worksheet A when one parent (or a third party) has primary physical custody of all of the children for whom support is being determined. A parent (or third party) has primary physical custody of a child if the child *lives with* that parent (or custodian) for *at least 243 nights* during the year. Primary physical custody is *determined without regard to whether a parent has primary, shared, or joint legal custody of a child. . . .*

> Use Worksheet B when (a) the parents share custody of all of the children for whom support is being determined, or (b) when one parent has primary physical custody of one or more of the children and the parents share custody of another child. Parents share custody of a child if the child *lives with* each parent for *at least 123 nights* during the year and each parent assumes financial responsibility for the child's expenses during the time the child *lives* with that parent. A parent does not have shared custody of a child when that parent has visitation rights that allow the child to spend *less than 123 nights* per year with the parent and the other parent has primary physical custody of the child. Shared custody is *determined without*

**IN RE A.D.N.**

[231 N.C. App. 54 (2013)]

> regard to whether a parent has primary, shared, or joint
> legal custody of a child. . . .

*Id.* (emphasis added).

Thus, under the guidelines promulgated pursuant to N.C. Gen. Stat. § 50-13.4(c1), a child is determined to "live[] with" a parent or third party based upon the number of nights a child spends with that person per year (without regard to whether the parent or third party has primary, shared, or joint legal custody of a child). *Id.*

It is reasonable to conclude similarly for purposes of N.C. Gen. Stat. § 7B-1103(a)(5) that whether a child resides with or lives with a particular person depends on the number of nights that the child spends with that person. Accordingly, we hold that the person with whom a child "resided" as used in N.C. Gen. Stat. § 7B-1103(a)(5) refers to the person with whom a child spent his or her nights.

In this case, respondent mother does not challenge on appeal petitioner's evidence that in 2011, Andy stayed with petitioner overnight for 25 nights in January, 24 nights in February, 26 nights in March, 26 nights in April, and for 16 of the 18 nights from 1 May 2011 to 19 May 2011. In other words, Andy spent an average of 85% of his nights with petitioner. Respondent mother cannot, therefore, reasonably contend that Andy did not reside with petitioner during the period from January 2011 through May 2011. Although respondent mother argues on appeal that Andy was merely visiting petitioner on the nights he stayed with her, the trial court reasonably concluded that Andy was living or residing with petitioner and only visiting respondent mother.

The question remains whether Andy resided with petitioner "continuously" from 2 January 2011 to 19 May 2011. Respondent mother first contends that N.C. Gen. Stat. § 7B-1103(a)(5) requires that Andy must have had "uninterrupted" overnight stays with petitioner for the relevant period in order to have standing.

We believe that resolution of this issue is guided by this Court's analysis when deciding a child's home state for purposes of the Uniform Child-Custody Jurisdiction and Enforcement Act ("UCCJEA"). Under the UCCJEA, " '[h]ome state' " is defined as "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding." N.C. Gen. Stat. § 50A-102(7) (2011). "A period of temporary absence of any of the mentioned persons is part of the period." *Id.*

In *Chick v. Chick*, 164 N.C. App. 444, 451-52, 596 S.E.2d 303, 309 (2004), this Court adopted a totality of the circumstances test for the determination whether a period of absence was temporary under the UCCJEA home state statute and held that when the children had lived in Vermont for 11 months preceding the filing of the action, barring a six-week period during which they lived in North Carolina, Vermont was the children's home state. Similarly, in *Hammond v. Hammond*, 209 N.C. App. 616, 633-34, 708 S.E.2d 74, 85-86 (2011), this Court held that the children's home state was North Carolina, despite the fact that the children had lived in Japan for nearly the entire six months immediately preceding the action, since the children lived in North Carolina for nearly two years prior to leaving for Japan and since the father believed, in moving to Japan, that the family would return to North Carolina.

Similarly, here, we do not believe that the General Assembly's requirement under N.C. Gen. Stat. § 7B-1103(a)(5) that a child reside with a person "for a continuous period of two years" requires that the child spend every single night with the person for that period. Just as a child can live with a parent in a state for "six consecutive months" despite extended absences from the state under the UCCJEA, N.C. Gen. Stat. § 50A-102(7), a child can reside continuously with a person for the purposes of N.C. Gen. Stat. § 7B-1103(a)(5) despite spending a limited number of nights away from that person's home.

The evidence in this case showed that in 2011, Andy was away from petitioner for only six nights in January, four nights in February, five nights in March, four nights in April, and two of the 18 nights from 1 May 2011 to 19 May 2011. In other words, Andy spent the night elsewhere on a very limited number of occasions. Based on this evidence, the trial court could properly determine that Andy resided with petitioner "for a continuous period of two years or more next preceding the filing of the petition or motion." *Id.*

Respondent mother nonetheless argues that this Court should adopt a test that looks only to the intention of the parties -- specifically to respondent mother's intention -- in determining whether Andy resided with petitioner continuously during the relevant period. Respondent mother cites *Grindstaff v. Byers*, 152 N.C. App. 288, 567 S.E.2d 429 (2002), and *Patterson v. Taylor*, 140 N.C. App. 91, 535 S.E.2d 374 (2000), in support of her argument. However, both of those cases refer to the intent of the parties when construing the terms of voluntarily-executed custody agreements, or contracts, between the parties. *See Grindstaff*, 152 N.C. App. at 296, 567 S.E.2d at 434; *Patterson*, 140 N.C. App. at 96-97, 535 S.E.2d at 378. Although it is true that " '[w]henever a court is

called upon to interpret a contract its primary purpose is to ascertain the intention of the parties at the moment of its execution[,]' " *Gilmore v. Garner*, 157 N.C. App. 664, 666, 580 S.E.2d 15, 18 (2003) (quoting *Lane v. Scarborough*, 284 N.C. 407, 409–10, 200 S.E.2d 622, 624 (1973)), respondent mother has pointed to no equivalent principle in this non-contract context. In any event, given the evidence in this case, the trial court could properly conclude that the fact respondent mother allowed Andy to spend the overwhelming majority of his nights with petitioner indicated that respondent mother intended for Andy to reside with petitioner and visit respondent mother.

In sum, we hold that the evidence supported the trial court's ultimate finding that Andy resided continuously with petitioner for the two-year period immediately preceding the filing of the petition. Consequently, petitioner had standing to file the TPR petition under N.C. Gen. Stat. § 7B-1103(a)(5), and the trial court did not err in concluding that it had subject matter jurisdiction over the action.

II

**[2]** Respondent mother next argues that the trial court erred by failing to appoint Andy a guardian ad litem ("GAL") for the TPR proceeding. N.C. Gen. Stat. § 7B-1108(b) (2011) provides that when a parent files a response to a TPR petition or motion that "denies any material allegation of the petition or motion, the court shall appoint a guardian ad litem for the juvenile to represent the best interests of the juvenile, unless the petition or motion was filed by the guardian ad litem pursuant to G.S. 7B-1103, or a guardian ad litem has already been appointed pursuant to G.S. 7B-601 [providing for appointment of GALs for juveniles in abuse, neglect, and dependency proceedings]."

Here, respondent mother filed a response to the petition denying many of the material allegations of the petition and denying that grounds existed to terminate her parental rights. The petition was not filed by a GAL, and no GAL had previously been appointed for Andy in an abuse, neglect, and dependency proceeding. The trial court was, therefore, required to appoint Andy a GAL under N.C. Gen. Stat. § 7B-1108(b).

However, respondent mother failed to object at trial to the failure of the trial court to appoint the child a GAL. This Court has previously held that in order to preserve for appeal the argument that the trial court erred by failing to appoint the child a GAL, a respondent must object to the asserted error below. *See In re Fuller*, 144 N.C. App. 620, 623, 548 S.E.2d 569, 571 (2001) (discussing "respondent's noncompliance with our rules" by failing to object to lack of GAL at trial level); *In re Barnes*,

**IN RE A.D.N.**

[231 N.C. App. 54 (2013)]

97 N.C. App. 325, 326, 388 S.E.2d 237, 238 (1990) (holding "respondent failed to comply with our Rules of Appellate Procedure" because "there was no objection or exception made at trial to the court's failure to appoint a guardian ad litem" for child). We are bound by these holdings, and respondent mother has, therefore, failed to preserve this issue for appeal. N.C.R. App. P. 10(a)(1).

We are aware that in both *Fuller* and *Barnes*, this Court invoked Rule 2 of the Rules of Appellate Procedure in order to reach the issue whether the trial court erred by failing to appoint a GAL for the child and, in both cases, found prejudicial error in the failure to appoint a GAL. *In re Fuller*, 144 N.C. App. at 623, 548 S.E.2d at 571; *In re Barnes*, 97 N.C. App. at 326-27, 388 S.E.2d at 238-39. However, there is no indication in those cases, as there is here, that the appealing respondent had repeatedly chosen substance abuse over the child's welfare throughout the child's life and had almost entirely abdicated responsibility for the child to the petitioner. *See In re Fuller*, 144 N.C. App. at 620, 548 S.E.2d at 569; *In re Barnes*, 97 N.C. App. at 326-27, 388 S.E.2d at 238-39.

Rule 2 of the Rules of Appellate Procedure provides that "[t]o prevent manifest injustice to a party . . . either court of the appellate division may, except as otherwise expressly provided by these rules, suspend or vary the requirements or provisions of any of these rules . . . ." We do not believe, under the facts of this case, that suspension of rules is required to prevent manifest injustice to respondent mother or Andy. We, therefore, affirm the order of the trial court.

Affirmed.

Chief Judge MARTIN and Judge STROUD concur.