IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-661

No. COA21-31

Filed 7 December 2021

Cabarrus County, No. 19CVD957

TRINA THOMAS and SCOTTY THOMAS, Plaintiffs,

v.

KIMBERLY OXENDINE and BRIAN A. THOMAS, Defendants.

Appeal by Defendant Kimberly Oxendine from orders entered 26 March 2019, 10 April 2019, 11 June 2019, and 17 April 2020 by Judge Juanita Boger-Allen in Cabarrus County District Court. Heard in the Court of Appeals 22 September 2021.

*Kathleen Arundell Jackson for Plaintiff-Appellees.*

*Ferguson, Hayes, Hawkins, & DeMay, PLLC, by James R. DeMay, for Defendant-Appellant.*

COLLINS, Judge.

¶ 1    Defendant Kimberly Oxendine[1] appeals the trial court's orders which culminated in sole legal and physical custody of her minor child being awarded to Plaintiffs, Trina and Scotty Thomas. We affirm the orders of the trial court.

---

[1] Defendant Brian A. Thomas is not a party to this appeal.

## I. Factual and Procedural History

Defendants Kimberly Oxendine ("Mother") and Brian A. Thomas ("Father") are the biological parents of Josie,[2] born in 2005. Plaintiffs Trina Thomas ("Grandmother") and Scotty Thomas ("Grandfather") (together, "Grandparents") are Josie's paternal grandparents. Mother, Father, Josie, and Skylar–Mother's child from a previous relationship–lived in Grandparents' home from 2006 to 2007. Father left Grandparents' home in 2007 while Mother, Josie, and Skylar remained in the home until 2008.

Mother met Stephen Oxendine ("Chip") in 2009. Mother, Josie, and Skylar moved into Chip's home in 2010, and Mother and Chip married in 2014. The couple had two children together, Carson and Diane.

After Mother, Josie, and Skylar moved out of Grandparents' home in 2008, Josie spent most weekends, parts of each summer, and every spring break with Grandparents. Grandparents picked Josie up from school when she was ill, took her to therapy appointments, and paid for and attended her school sporting events. They also provided her with clothing, school supplies, and other essentials on a regular basis, and had recently purchased her a laptop. Grandparents also paid most child support payments on Father's behalf. Josie has a strong bond with Grandparents. Grandmother has been a "constant emotional resource" for Josie, and Mother relied

---

[2] We use pseudonyms in this case to protect the identity of the minor children.

on Grandmother's guidance and support in parenting Josie.

¶ 5        Josie's relationship with Chip was strained. Chip used unusually harsh punishment methods to discipline Josie, including forcing her to stay in an unairconditioned, unvented upstairs room during the summer, which "was far too hot for healthy living conditions." Chip yelled at her and called her names. He would yell in her face, getting so close he would spew spit on her. Mother and Chip sometimes refused to let Josie stay with Grandparents as punishment. Chip had also threatened to kick Josie out of the house, telling her to "pack her things and leave." Mother did not get involved when Chip was aggressive towards Josie. Josie is afraid of Chip and does not believe that Mother tries to protect her.

¶ 6        After bruises were found on Skylar's buttocks in 2011, Cabarrus County social services[3] investigated the Oxendine home. Social services closed the case, instructing Mother and Chip on proper discipline and recommending that they receive parenting and counseling services.

¶ 7        In May 2016, Josie wrote a letter stating she'd "rather kill herself" than live in the home with Chip. Mother had Josie admitted to Brynn Mar Hospital for treatment. Josie was admitted for depression and suicidal ideation and stayed in the hospital for nine days.

---

[3] Although documents bearing the names Cabarrus County Department of Social Services (CCDSS) and Cabarrus County Department of Human Services (CCDHS) are provided in the Record, these names refer to the same entity. We use "Cabarrus County social services" for consistency and to avoid confusion.

¶ 8        While Josie was being treated at Brynn Mar, Grandmother stayed with Josie. Mother visited but did not spend nights at the hospital as she feared Chip would be "mad" at her for leaving the other children. Mother told Grandmother that because of the strained relationship between Josie and Chip, she "knew it would come to this," and that she had tried to talk to Chip but he would not listen.

¶ 9        Upon release from the hospital, Josie was prescribed anti-depressant medication and recommended for outpatient therapy. Mother enrolled Josie in therapy with Daymark Recovery Services and Turning Point Family Services. Josie reported to Daymark that she didn't "feel safe around Chip" and that she was scared Chip would "get mad and hit her mother." Daymark recommended the entire family enroll in in-home, teamwork therapy. No evidence was presented that the family followed through with Daymark's recommendation. Josie only attended one session at Daymark and then stopped; Mother testified that this was due to Medicaid eligibility. Mother testified that Josie was in counseling with Turning Point for "quite a while" and then no longer needed treatment, but did not provide evidence to support her assertion.

¶ 10       On 19 February 2019, Chip discovered that Josie was using a cell phone that she was not permitted to have and confronted her. Chip "grabbed [Josie] by her shoulders, flinging her to the ground." The following day, when Josie arrived home from school, Chip confronted her again and the situation escalated. That day, Mother called Grandmother and asked if Josie could stay with Grandparents because things

were "not working with [Josie] and Chip." Grandparents agreed to have Josie stay with them. Josie stayed with Grandparents for about a week.

¶ 11 Following this incident, Cabarrus County social services received a report about the family. Mother suspected the report had been filed by Grandparents and demanded that Josie return home on 24 February 2019. Subsequently, Cabarrus County social services investigated the report, but closed the case with a recommendation that the Oxendine family obtain individual and family counseling services to address any discord present in the home.

¶ 12 Grandparents filed a Complaint for Child Custody and Motion for Emergency Custody on 26 March 2019. The trial court entered an Order for Emergency Custody on that date, awarding temporary emergency custody of Josie to Grandparents and setting the matter for a temporary custody hearing on 3 April 2019. Following the temporary custody hearing, the trial court continued temporary custody of Josie with Grandparents and determined that Mother should have contact with Josie, but that Chip should not. The trial court entered a written Temporary Custody Order on 10 April 2019.

¶ 13 On 9 April 2019, Mother filed an Answer and Motion in the Cause. Mother moved to dismiss Grandparents' complaint pursuant to N.C. Gen. Stat. § 1A-1, Rule 12(b)(6), for failure to state a claim upon which relief can be granted, arguing that Grandparents' complaint "does not list even one specific fact or allegation regarding [Mother], or her parenting abilities to properly meet their burden under N.C. [Gen.

Stat. §] 50-13.1(a) to show [Mother] has either acted inconsistently with her constitutionally protected right to parent, or that she is an unfit [] parent" and that Grandparents "do not have standing to seek custody of the minor child at issue pursuant to N.C. [Gen. Stat. §] 50-13.1(a)" because Grandparents did not "allege an in loco parentis relationship with the minor child."

¶ 14    The trial court held a hearing on Mother's motion to dismiss on 6 May 2019. By order entered 12 June 2019 ("Order Denying Motion to Dismiss"), it denied Mother's motion, finding and concluding that Grandparents had standing to bring the custody action and that Mother "engaged in conduct inconsistent with her protected status as a parent as demonstrated by clear and convincing evidence."

¶ 15    A hearing was held on 2 December 2019 to address Josie's best interests and determine permanent custody. The trial court entered an Amended Permanent Custody Order on 17 April 2020 wherein it concluded, in relevant part, that "[i]t is in the best interest of the minor child that the [Grandparents] have sole legal and physical custody of the minor child" and that Mother be granted visitation as outlined in the order.

¶ 16    Mother appealed the Order for Emergency Custody, the Temporary Custody Order, the Order Denying Motion to Dismiss, and the Amended Permanent Custody Order. On appeal, Mother's arguments are directed only to the Order Denying Motion to Dismiss and the Amended Permanent Custody Order.

## II. Discussion

### A. Standing

Mother first argues that the trial court erred by denying her motion to dismiss Grandparents' complaint for custody because the trial court erroneously determined that Grandparents have standing to bring a custody action under N.C. Gen. Stat. § 50-13.1(a).

Standing is required to confer subject matter jurisdiction. *Wellons v. White*, 229 N.C. App. 164, 176, 748 S.E.2d 709, 718 (2013). "A [trial] court's subject matter jurisdiction over a particular matter is invoked by the pleading." *Boseman v. Jarrell*, 364 N.C. 537, 546, 704 S.E.2d 494, 501 (2010). At the motion to dismiss stage, all factual allegations in the pleadings are viewed in the light most favorable to the plaintiff, granting the plaintiff every reasonable inference. *Grindstaff v. Byers,* 152 N.C. App. 288, 293, 567 S.E.2d 429, 432 (2002). We review de novo whether a plaintiff has standing to bring a claim. *Fuller v. Easley*, 145 N.C. App. 391, 395, 553 S.E.2d 43, 46 (2001).

N.C. Gen. Stat. § 50-13.1(a) provides that "[a]ny parent, relative, or other person . . . claiming the right to custody of a minor child may institute an action or proceeding for the custody of such child." N.C. Gen. Stat. § 50-13.1(a) (2019). The statute "grants grandparents the broad privilege to institute an action for custody . . . ." *Eakett v. Eakett*, 157 N.C. App. 550, 552, 579 S.E.2d 486, 488 (2003). "Although grandparents have the right to bring an initial suit for custody, they must

still overcome" the parents' constitutionally protected rights. *Sharp v. Sharp*, 124 N.C. App. 357, 361, 477 S.E.2d 258, 260 (1996).

¶ 20 To survive a motion to dismiss for lack of standing, grandparents must allege both that they are the grandparents of the minor child and facts sufficient to demonstrate that the minor child's parent is unfit or has engaged in conduct inconsistent with their parental status. *See, e.g.*, *Rodriguez v. Rodriguez*, 211 N.C. App. 267, 276, 710 S.E.2d 235, 241-42 (2011) ("[The] plaintiffs had standing to proceed in an action for custody pursuant to N.C. Gen. Stat. § 50-13.1(a) as they alleged they are the grandparents of the children and that [the] defendant had acted inconsistently with her parental status and was unfit because she had neglected the children.") (citation omitted); *Grindstaff*, 152 N.C. App. at 292, 567 S.E.2d at 432 ("[G]randparents alleging unfitness of their grandchildren's parents have a right to bring an initial suit for custody[.]").

¶ 21 Here, Grandparents alleged in their complaint, in relevant part, the following:

> 4. . . . Trina Thomas and Scotty Thomas are the child's paternal grandparents.
>
> . . . .
>
> 6. [Grandparents] have standing pursuant to [N.C. Gen. Stat.] § 50-13.l(a) to file this action for child custody in that they have [] had a substantial and material contact with the child throughout her life in the nature of a parent and child.
>
> . . . .
>
> 8. [Mother] has acted inconsistent with her constitutionally

protected status as a parent. She has repeatedly and willfully failed to protect the child from her husband [Chip].

. . . .

b. Shortly after [Carson]'s birth, [Mother] called the Plaintiffs to report that she had left Chip because of his poor treatment of her and [Josie] who was about four years old. However, she returned shortly thereafter because [Chip] refused to let her take the infant [Carson] with her.

c. When [Josie] was four, she cut her hair with a pair of scissors. As punishment, [Chip] shaved the child's head to "teach her a lesson."

d. Throughout the time [Josie] has been in the home with [Chip], he has singled her out for hostile treatment. He is easily agitated and frequently yells at [Josie] calling her names. At times he gets so close to [Josie]'s face, the force of his screaming has caused him to spit on the child.

e. When [Josie] was eight years old, she developed chronic constipation. [Chip] belittled her and called her names. He refused to allow [Mother] to follow [Josie]'s doctor's recommendations for treatment, saying, "She can s*** on her own. I do it every morning."

f. Frequently [Josie] is the victim of [Chip]'s unfair punishment. In the Spring of 2016, [Josie] stated that she would rather kill herself than live with [Chip]. As a result, she was hospitalized for mental health treatment.

g. On February 19, 2019, [Chip] assaulted [Josie]. Although he did not hit the child, he grabbed her and caused her to fall on the ground. [Mother] called [Grandparents] to the home. When [they] arrived at the Oxendine home, [Chip] stated, "All I got to say is

you better be glad your grandparents are here."

h. On February 20, 2019, [Mother] called [Grandmother], crying and asked her to come pick up [Josie], saying, "I need you to meet me to get [Josie]. Things are not working with her and Chip." [Mother] admitted that Chip had told [Josie] to get her things and prepare to leave the home. [Mother] stated that she wanted to leave [Chip] but she had her other children to consider.

i. By February 24, 2019, [Mother] was demanding that [Josie] return to her home. She accused [Grandparents] of calling [Cabarrus County social services] regarding [Chip]'s domestic violence incident on February 19, 2019. According to [Mother], the Department is investigating her home.

j. Since that time, [Mother] has refused to allow [Josie] to visit [Grandparents'] home. They have had limited telephone contact with her. The substance of the calls leads them question [Josie]'s safety in the Oxendine home. [Mother] stated that she was not going to allow [Josie] to visit her grandparents until the [social services'] investigation was over.

k. [Social services] investigated the Oxendine home after [Chip] left bruises on the minor child [Skylar].

¶ 22 Viewed in the light most favorable to Grandparents, and granting Grandparents the benefit of every reasonable inference, Grandparents have alleged both that they are Josie's grandparents and that Mother acted inconsistently with her constitutionally protected status as a parent by repeatedly and willfully failing to protect Josie from danger and harm caused by Chip. Accordingly, Grandparents had standing to proceed in an action for custody of Josie pursuant to N.C. Gen. Stat. § 50-13.1(a).

¶ 23    Mother asserts that "the trial court must find that a parent has acted inconsistent with his or her constitutionally protected status as a parent by clear and convincing evidence for grandparents to have standing to seek custody of a minor child." (Original in all capital letters). Mother argues that Grandparents lacked standing to bring this action because the trial court's determination that Mother acted inconsistent with her constitutionally protected status as a parent was not supported by the evidence.

¶ 24    Mother confuses

> two distinct but related stages in a custody dispute between a parent and non-parent, namely: (1) the standing and pleading requirements of the complaint at the motion to dismiss stage, and (2) the burden of producing evidence at the custody hearing sufficient to prove that a parent has waived the constitutional protections guaranteed to them.

¶ 25    *Gray v. Holliday*, 2021-NCCOA-178, ¶19 (unpublished). Where, as here, the pleading alleges sufficient facts to show that plaintiffs are the grandparents of the minor child and that the parent is unfit or has engaged in conduct inconsistent with their parental status, Grandparents had standing, and the trial court had subject matter jurisdiction to hear the case.

**B. Conduct Inconsistent with Parental Status**

¶ 26    Mother argues that the trial court erred by denying Mother's motion to dismiss Grandparents' custody action because the trial court's determination that Mother "engaged in conduct inconsistent with her protected status as a parent" was not

supported by clear and convincing evidence.

¶ 27        "A trial court's determination that a parent's conduct is inconsistent with his or her constitutionally protected status must be supported by clear and convincing evidence." *Adams v. Tessener*, 354 N.C. 57, 63, 550 S.E.2d 499, 503 (2001).  In custody actions, "the trial court's findings of fact are conclusive on appeal if there is evidence to support them, even though the evidence might sustain findings to the contrary." *Owenby v. Young*, 357 N.C. 142, 147, 579 S.E.2d 264, 268 (2003).  Findings of fact are likewise conclusive on appeal if they are unchallenged.  *Peters v. Pennington*, 210 N.C. App. 1, 12-13, 707 S.E.2d 724, 733 (2011).  We review whether the findings of fact support the conclusions of law de novo.  *Hall v. Hall*, 188 N.C. App. 527, 530, 655 S.E.2d 901, 904 (2008).

¶ 28        Even when grandparents have standing to bring a custody action, to gain custody they must still overcome a parent's "constitutionally-protected paramount right . . . to custody, care, and control of [the child]." *Petersen v. Rogers*, 337 N.C. 397, 403-04, 445 S.E.2d 901, 905 (1994).  "When grandparents initiate custody lawsuits under [N.C. Gen. Stat.] § 50-13.1(a), . . . the grandparent[s] must show that the parent is unfit or has taken action inconsistent with her parental status in order to gain custody of the child." *Eakett,* 157 N.C. App. at 553, 579 S.E.2d at 489.  If, however, the grandparents are not able to show that the parent has lost their protected status, the custody claim against the parent must be dismissed. *See, e.g.*, *Owenby*, 357 N.C. at 148, 579 S.E.2d at 268 (reinstating the trial court's order

dismissing grandparent's custody action where grandparent "failed to carry her burden of demonstrating that defendant forfeited his protected status").

¶ 29          Here, Mother challenges the following nine of the trial court's 66 findings of fact in its Order Denying Motion to Dismiss as not supported by competent evidence:

> 12. The minor child views [Grandfather] as the only father she has ever known and considers both [Grandmother] and [Mother] as her mother figures.
>
> . . . .
>
> 30. [Grandparents] exercised a significant amount of parental responsibility for the minor child, which was formed and perpetuated by [Mother].
>
> . . . .
>
> 42. [Mother] has failed to protect the minor child.
>
> . . . .
>
> 51. That after the February 2019 incident, [Chip] demanded that the minor child pack her things and leave the Oxendine home.
>
> . . . .
>
> 53. Based on her actions, [Mother] believed that there was a substantial risk of harm to the minor child if the minor child remained in the Oxendine home.
>
> . . . .
>
> 55. [Mother] did not indicate that the placement would be temporary. [Grandparents] cared for the minor child as they had on numerous other occasions. [Mother] abdicated her parental responsibilities while [Grandparents] often cared for the daily needs of the minor child.

. . . .

60. That [Mother]'s decision to demand that [Grandparents] return the minor child to the Oxendine home was adverse to the minor child.

61. [Mother] unilaterally altered the established relationship between [Grandparents] and the minor child by ceasing all contact between the minor child and [Grandparents] upon being contacted by [social services]. That this act by [Mother] was adverse to the minor child.

. . . .

63. There is a substantial risk of harm to the minor child while in the Oxendine home.

¶ 30    Our review of the record reveals clear and convincing evidence to support each of the nine challenged findings. Moreover, even in the absence of every contested finding, the unchallenged findings support the trial court's conclusion that Mother "engaged in conduct inconsistent with her protected status as a parent[.]" *See Hall*, 188 N.C. App. at 532, 655 S.E.2d at 905 (affirming a modification of custody on the unchallenged findings).

¶ 31    The unchallenged findings include, in relevant part:

14. [Grandparents] have played an integral part in rearing the minor child. [Mother] and the minor child moved in with [Grandparents] in 2006 when the minor child was [one] year old.

. . . .

16. [Grandparents] provided housing, clothing, transportation[,] and financial assistance for the minor

child while the minor child resided in the home.

. . . .

18. [Grandparents] continued to have ongoing and consistent contact with the minor child after moving from [Grandparents'] home and continued to provide financially for the minor child. [Grandparents] purchased clothing and other essential items for the minor child.

19. The minor child stayed with [Grandparents] on weekends, every Spring Break, holidays and every summer, with the exception of summer 2016 when the minor child was hospitalized. The minor child was in the home of [Grandparents] every weekend unless prevented by [Chip]. Friends and neighbors of [Grandparents] were accustomed to seeing the minor child with [Grandparents] during the times mentioned above.

20. [Grandparents] have been involved in the minor child's education by assisting with homework and school projects. [Grandparents] purchased school clothing and supplies each year for the minor child. In February 2019, [Grandparents] purchased a computer for the minor child.

21. [Grandparents] supported the minor child in her extracurricular activities and paid the fees for the minor child to play sports. The minor child also attended social and family gatherings events with [Grandparents].

. . . .

31. [Mother] relied on [Grandparents] in a parental capacity for the minor child and intended for [Grandparents] to shoulder the parental responsibility.

32. [Grandmother] has been a constant emotional resource for the minor child and [Mother], especially with matters relating to the minor child and the

dynamics in [Mother]'s household.

. . . .

34. [Mother] benefitted by sharing the decision-making, caretaking, and financial responsibility for the minor child with [Grandparents]. . . .

. . . .

37. The minor child is in fear of [Chip] and does not believe that [Mother] makes an effort to protect her.

38. During the summer of 2016, the minor child was hospitalized for mental health treatment after the minor child stated that she would rather kill herself [] than live with [Chip].

39. During the minor child's hospital stay, [Grandmother] was at the hospital each day with the minor child. [Mother] told [Grandmother] that she was unable to be at the hospital daily because [Chip] stated that [Mother] did not need to be there because she had other children at home. . . .

40. An incident occurred in the Oxendine home in February 2019 where the minor child ended up on the floor after being confronted by [Chip].

41. [Mother] was in the home, but did not intervene.

. . . .

43. [Mother] admits that [Chip] and the minor child have had arguments that have been inappropriate.

. . . .

45. The minor child does not feel welcome in the Oxendine home, suffers from constant anxiety and feels that she is treated differently from her other siblings who reside in the Oxendine home.

. . . .

48. That [Mother], [Chip] nor the minor child have demonstrated the ability to deescalate conflicts.

49. The minor child's presence in the Oxendine home has created a hostile environment for the minor child.

50. The minor child has been unable to cope in the Oxendine home.

. . . .

52. [That after the February 2019 incident], [Mother] called [Grandmother] and asked her to immediately meet and keep the minor child due to things not working out between [Chip] and the minor child.

. . . .

54. [Mother] voluntarily placed the minor child with [Grandparents] and provided no definitive timeframe, oversight or instructions.

. . . .

64. [Mother] has engaged in conduct inconsistent with her protected status as a parent as demonstrated by clear and convincing evidence.

These unchallenged findings show that Mother failed to protect Josie from Chip's abusive behavior and inappropriate discipline. This failure alone is conduct inconsistent with Mother's protected status as a parent. *See Sharp*, 124 N.C. App. at 361, 477 S.E.2d at 260 (allegations in complaint sufficient to survive motion to dismiss where grandparents alleged that parent's actions put her children at a "substantial risk of harm"); *Grindstaff*, 152 N.C. App. at 293, 567 S.E.2d at 432 (allegations in complaint sufficient to survive motion to dismiss where grandmother

alleged parents had "not shown they are capable of meeting the needs of the children for care and supervision"). The unchallenged findings also show that, by her volitional acts, Mother "relinquish[ed] otherwise exclusive parental authority to" Grandparents. *See Rodriguez*, 211 N.C. App. at 277, 710 S.E.2d at 242 (quotation marks and citation omitted). Such voluntary relinquishment is the "gravamen" of inconsistent conduct. *Id.*

¶ 33        Mother additionally argues that, by finding that she "had little or no income," the trial court improperly relied on her socioeconomic status in its determination that she acted inconsistent with her parental rights.

¶ 34        It is true that a parent's socioeconomic status is not relevant to a determination of a parent's unfitness or acts inconsistent with a parent's constitutionally protected status. *Dunn v. Covington*, 272 N.C. App. 252, 265, 846 S.E.2d 557, 567 (2020) (citing *Raynor v. Odom*, 124 N.C. App. 724, 731, 478 S.E.2d 655, 659 (1996)). However, where the remaining findings are sufficient to support the court's conclusion that Mother acted inconsistently with her parental status, any potential error was harmless. *See In re S.R.F.*, 376 N.C. 647, 2021-NCSC-5, ¶15. In summary, the challenged findings of fact are supported by clear and convincing evidence. The unchallenged findings of fact, by themselves and together with the challenged findings, support the trial court's conclusion that Mother "engaged in conduct inconsistent with her protected status as a parent[.]"

**C. Best Interests Determination**

¶ 35        Mother argues the trial court abused its discretion by concluding, "it is in the best interest of the minor child that [Grandparents] have sole legal and physical custody of the minor child."

¶ 36        Where a parent's conduct is determined to be inconsistent with their constitutionally protected status, the trial court will determine custody using the "best interest of the child" standard. *Tessener*, 354 N.C. at 62, 550 S.E.2d at 502. "Before awarding custody of a child to a particular party, the trial court must conclude as a matter of law that the award of custody to that particular party 'will best promote the interest and welfare of the child.'" *Steele v. Steele*, 36 N.C. App. 601, 604, 244 S.E.2d 466, 468 (1978) (quoting N.C. Gen. Stat. § 50-13.2(a)).

¶ 37        The standard of review for a best interests determination in a custody dispute is well-established:

> [T]he trial court's findings of fact are conclusive on appeal if supported by substantial evidence, even if there is sufficient evidence to support contrary findings. . . . Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . Unchallenged findings of fact are binding on appeal. . . . The trial court's conclusions of law must be supported by adequate findings of fact. . . . Absent an abuse of discretion, the trial court's decision in matters of child custody should not be upset on appeal.

*Peters*, 210 N.C. App. at 12-13, 707 S.E.2d at 733 (quotation marks and citations omitted).

Mother challenges the following 13 of the trial court's 75 findings of fact in its Amended Permanent Custody Order as not supported by the evidence:

> 8. . . . [Mother]'s [other] children [i.e. Skylar, Carson, and Diane] considered the Plaintiffs [Trina and Scotty Thomas] as grandparents prior to the initiation of this action.
>
> . . . .
>
> 11. . . . [Mother] stated that [Chip] overstepped her and punished [Josie] inappropriately. [Grandparents] asked [Mother] if they could talk with [Chip] and [Mother] stated that it would not help to do so.
>
> 12. [Chip] and the minor child have had arguments and interactions that have been inappropriate. [Mother] has not appropriately intervened.
>
> . . . .
>
> 15. . . . [Mother] has not received the necessary psychological education and treatment to help her cope within the Oxendine family dynamics.
>
> . . . .
>
> 30. [Mother] has not shown any interest in visiting or knowing anything about [Josie]'s school. [Grandmother] has provided updates and sent pictures to [Mother] regarding [Josie] even though [Mother] rarely responds.
>
> 31. [Mother] does not effectively co-parent and demonstrates an unwillingness to do so. [Mother]'s actions demonstrate that she is bitter towards [Josie] and [Grandmother].
>
> 32. . . . [Mother]'s actions appear to be punitive in nature and are passive aggressive.
>
> . . . .
>
> 40. . . . It was inappropriate and against [Josie]'s best

interest for the Oxendines to isolate [Josie] from [Grandparents] as a punishment.

. . . .

44. Over time, [Josie] was shunned by her family. . . .

. . . .

54. [Mother] has not taken advantage of the services offered to her and her family and failed to comply with the recommendations made to help her effectively parent [Josie] and provide [Josie] with a safe and healthy home environment.

55. [Mother] has failed to protect the minor child while in her care. [Mother] has failed to participate and/or demonstrate skills on how to deescalate conflicts within her household and with [Josie].

56. During various points of her life, [Josie] has been withheld from people who have been caregivers to her. [Josie] has had significant routine experience to events such as hitting, choking, pushing, shaking, yelling, and punishment to a point where bruising occurred.

. . . .

60. . . . [Mother] shared with [Grandmother] that [Chip] told her that he can't be around [Josie] and presented [Mother] with an ultimatum. . . .

Our review of the record reveals clear and convincing evidence to support each of the challenged findings. Moreover, even in the absence of every contested finding, the unchallenged findings support the trial court's conclusion that "it is in the best interest of the minor child that [Grandparents] have sole legal and physical custody of the minor child." These unchallenged findings include:

14. On November 28, 2010, a report was made to the

Department of Social Services alleging that [Chip] bruised [Skylar]. [Skylar]'s paternal grandparents observed bruising on [Skylar] and took her to the hospital. . . . [Mother] indicated that she did not know about the bruising until after [Skylar] was taken to the hospital. [Mother] confirmed that [Chip] caused the bruising on [Skylar]. . . . [Chip] admitted that he hit [Skylar] out of anger by pulling her pants down and spanking her with his hand. . . .

. . . .

16. The social worker involved with the Oxendine family described [Mother] as being nonchalant in her disciplining and allowed [Chip] to take on this responsibility although he didn't have any experience. . . . The social worker also noted that [Mother] told her she would start counseling for [Josie]. . . . No evidence was presented to show that [Mother] followed through with obtaining counseling for [Josie] or herself at this time. . . .

. . . .

23. [Josie] needs consistency and structure. [Grandparents] have [Josie] on a schedule.

. . . .

27. . . . [Since living with Grandparents], [Josie]'s grades have improved and [she] is progressing in therapy. [Josie]'s self-esteem has improved.

. . . .

38. [Chip] and [Josie] have a tumultuous relationship. From the onset of the relationship between [Mother] and [Chip], [Grandparents] noticed that Chip was overly harsh in punishing [Josie]. [Grandparents] witnessed [Chip] calling [Josie] names in front of [Mother], but [Mother] would not do anything.

. . . .

40. [Chip] would often tell [Josie] to pack her things and leave. There were other times when [Chip] would withhold [Josie]'s visits with [Grandparents]. The Oxendines believe that [Josie]'s visiting with [Grandparents] was the "only thing" that [Josie] seemed to like. . . . It was inappropriate and against [Josie]'s best interest for the Oxendines to isolate [Josie] from [Grandparents] as punishment.

. . . .

46. In May 2016, [Josie] threw a note downstairs stating that she wanted to kill herself if she had to continue living with [Chip]. [Josie] was hospitalized on May 13, 2016 at Atrium Health until a bed became available at Brynn Marr Hospital. [Grandmother] stayed with [Josie] while hospitalized. [Mother] was unable to stay because [Chip] relayed that [Mother] had other kids at home to care for.

. . . .

48. . . . [Josie] received an Admissions Assessment and reported that she will kill herself if she must go back to live with her stepfather. [Josie] reported that her stepfather is abusive and physically punishes her leaving whip marks. [Josie] also reported having nightmares about her stepfather. . . .

49. . . . [Josie] reported that she and her mother "go at it" and "yell at each other." [Josie] expressed that she did not feel safe around [Chip] and was scared [Chip] would get mad and hit her mother. [Josie] also expressed that "about every day" she (Josie) and [Chip] would "get into arguments." . . .

. . . .

53. [Josie] has consistently cried out for help for years. [Mother] failed to ensure that [Josie]'s psychological and emotional needs were met.

. . . .

57. An altercation occurred between [Josie] and [Chip] on February 19, 2019. Prior to said altercation, [Josie] and [Skylar] were arguing about a cellphone while they both were in the bathroom . . . [Chip] got out of bed and headed towards the bathroom to get the phone. . . .

58. [Josie] ended up on the floor after being confronted by [Chip]. [Chip] yelled at [Josie] causing his spit to come in contact with [Josie]'s face. [Chip] demanded that [Josie] pack her things and leave the Oxendine home. The next day, [Mother] called [Grandmother] and asked her to meet her and keep [Josie] due to things not working out between Chip and [Josie].

. . . .

60. . . . [Josie] reported that [Chip] grabbed her by her shoulders, "flinging her to the ground." When talking about this event [Mother] told [Grandparents] that [Chip] "bowled her (Josie) over." [Mother] called [Grandmother] and indicated that [she] would need to meet her to pick up [Josie] because "things weren't working out with [Josie] and Chip." . . . [Josie] shared that she heard [Mother] and [Chip] fighting and [Chip] kept saying that [Josie] is the problem. [Mother] subsequently sided with [Chip]. [Josie] shared, "I can't take it anymore. I hate this family."

. . . .

62. The April 25, 2019 assessment from Creative Counseling and Learning Solutions found that [Josie] has experienced a threat of serious harm by her stepfather [Chip] on numerous occasions from ages 6-12. [Josie] has heard about the Oxendines physically fighting, hitting, slapping, kicking and pushing each other. . . . [Josie] has repeatedly been told that she is no good, been yelled at in scary ways, and has received threats of abandonment, and removal by her stepfather. This conduct has worsened throughout [Josie]'s life. [Josie] does not feel safe in the Oxendine home. The court adopts these findings.

. . . .

64. The court adopts the findings of the April 25, 2019 assessment that [Josie] has not experienced a singular traumatic experience, [but] rather years of events which are leading to both behavioral and emotional responses to which [Josie] feels she has no control. [Josie] has directly experienced violent acts, both toward her as well as her mother. This includes violence to her in the form of harsh punishments, punishments resulting in bruises to her sister, and violence toward her mother. She has also learned about events occurring to others. [Josie] experiences excessive worry that something else is going to happen and is always "walking on egg shells." [Josie] has experienced intrusion symptoms including recurring distressing dreams in which the content and effect of the dream are related to the trauma events, dissociative reactions in which she reports feeling as if the trauma events are occurring in the present, intense and prolonged psychological distress at exposure to internal and external cues that resemble an aspect of the trauma events, such as fighting and heat. . . . [She experiences] persistent and distorted cognitions about the cause of the traumatic event, negative emotional state, including horror, fear, guilt, shame, anger, and vindictiveness. [Josie] experiences diminished interest in significant activities and will often provoke problems in what was a pleasant experience. [Josie] feels estranged from others. She additionally is experiencing reactivity symptoms including irritable behavior and anger responses, hypervigilance, exaggerated startle response, and poor concentration problems.

65. The family dynamics are such that [Josie] is exposed to physical and emotional abuse while in the care of [Mother].

66. [Josie] has a need to reside in a safe environment. [She] needs emotionally healthy caretakers who are actively involved in her life. . . .

. . . .

68. . . . [Mother] expressed no intent of separating from [Chip].

¶ 40 The challenged findings of fact are supported by competent evidence and the unchallenged findings, by themselves and together with the challenged findings, support the trial court's conclusion that "it is in the best interest of [Josie] that [Grandparents] have sole legal and physical custody of the minor child." The trial court did not abuse its discretion in granting Grandparents custody. *See Cox v. Cox*, 133 N.C. App. 221, 228, 515 S.E.2d 61, 67 (1999) ("A trial court is given broad discretion in determining the custodial setting that will advance the welfare and best interest of minor children.").

**D. Order that Mother Complete a Psychiatric Evaluation**

¶ 41 Mother argues that the trial court abused its discretion when it "condition[ed] [her] custodial rights upon undergoing a psychiatric evaluation when there was no evidence that [her] mental health affected her parenting of the minor child, and [ordered her] to take prescription medication."

¶ 42 "In cases involving child custody, the trial court is vested with broad discretion." *Browning v. Helff*, 136 N.C. App. 420, 423, 524 S.E.2d 95, 97 (2000). "The decision of the trial court should not be upset on appeal absent a clear showing of abuse of discretion." *Id.* (citation omitted). This Court has affirmed the decisions of trial courts ordering a psychological evaluation. *See, e.g., Maxwell v. Maxwell*, 212 N.C. App. 614, 620-21, 713 S.E.2d 489, 493-94 (2011) (affirming the trial court's decision to order a mental health evaluation as a condition of father's visitation rights); *Pass v. Beck*, 156 N.C. App. 597, 601, 577 S.E.2d 180, 182 (2003) (holding that

"the trial court did not abuse its discretion in delaying determination of the best interests of the child regarding visitation pending a recommendation from a psychologist"); *Rawls v. Rawls*, 94 N.C. App. 670, 676-77, 381 S.E.2d 179, 183 (1989) (holding that the trial court did not abuse its discretion by requiring a defendant to consult a psychiatrist or a psychologist before awarding specific visitation rights).

¶ 43 Here, the court ordered:

> 19. [Mother] shall undergo a psychological evaluation and comply with all recommended education and treatment. [Mother] shall reveal to the treatment evaluator/ provider her prior diagnosis and suicide attempt and the name and contact information of her past and current treatment provider(s). [Mother] shall provide any documentation requested by the treatment evaluator/ provider including a release of medical records. In addition [Mother] shall provide the treatment evaluator/provider with a copy of this Order and the April 10, 2019 temporary custody order. [Mother] shall also request to be evaluated to determine the necessity for her to be prescribed any medication. [Mother] shall keep all medical appointments and follow the treatment plan of her medical providers. [Mother] shall comply with taking her medication as prescribed by her medical provider.

¶ 44 Contrary to Mother's assertion, the trial court did not "condition her custodial rights upon undergoing a psychiatric evaluation." Nonetheless, such a condition is permissible and ordering Mother to undergo a psychiatric evaluation was within the broad discretion of the trial court. *See Maxwell*, 212 N.C. App. at 621, 713 S.E.2d at 494.

¶ 45 The following findings of fact support the trial court's order:

15. During the [2011 social services investigation], [Mother] told the social worker that she had been diagnosed with PTSD and Borderline Personality Disorder. She also stated that she was diagnosed as manic and had a prior suicide attempt. [Mother] stated that she attended Daymark and was taking medication but stopped because it made her sleep a lot. [Mother] has not received the necessary psychological education and treatment to help her cope within the Oxendine family dynamics.

16. The social worker involved with the Oxendine family described [Mother] as being nonchalant in her disciplining and allowed [Chip] to take on this responsibility although he didn't have any experience. . . . The social worker also noted that [Mother] told her she would start counseling for [Josie]. . . . No evidence was presented to show that [Mother] followed through with obtaining counseling for [Josie] or herself at this time. . . .

. . . .

67. [Mother] . . . need[s] parenting classes, coping skills, individual therapy and family therapy.

Mother challenges the portion of finding of fact 15 that states she "has not received the necessary psychological education and treatment to help her cope within the Oxendine family dynamics." Cabarrus County social services' records indicate that Mother was diagnosed with PTSD and Borderline Personality Disorder in 2008 and stopped taking her medication. She was diagnosed as manic and had a prior suicide attempt. Further, there was no evidence before the trial court that Mother and Chip engaged in therapy or services offered to help them effectively parent, including the recommended course of in-home, family therapy and training.

This evidence was competent to support the challenged finding. Based on a

review of the findings, it is apparent that the trial court's decision to require Plaintiff to undergo a psychological evaluation and comply with all recommendations did not represent an abuse of discretion. *See id.*

**E. Order that Chip Complete Programming**

Mother finally argues that the trial court abused its discretion when it ordered Chip to complete, and provide the court with proof of completion, a series of parenting classes and trainings, and anger management and substance abuse evaluations. Mother asserts that a trial court may not condition a parent's custodial and visitation rights on the actions of a third-party. Mother mischaracterizes the court's order, and her argument is without merit.

The challenged portion of the Amended Permanent Custody Order does not condition Mother's visitation with Josie on Chip's compliance with the order; rather, the order conditions Chip's ability to have contact with Josie on his compliance with the order. Mother argues that these conditions violate Chip's constitutional due process rights. We decline to address this argument as Mother does not have standing to assert Chip's constitutional rights. *Transcon. Gas Pipe Line Corp. v. Calco Enters.*, 132 N.C. App. 237, 247, 511 S.E.2d 671, 678 (1999) ("Ordinarily, one may not claim standing . . . to vindicate the constitutional rights of some third party.") (citation omitted).

The order does state that Mother's "visitation shall occur at the Oxendine home so long as Chip . . . is not present in the home at any time during the weekend of

[Mother's] visitation. [Mother's] visitation shall immediately cease if Chip . . . is/has been in the home during the visitation period."

¶ 51　　Trial courts possess broad discretion to fashion visitation arrangements appropriate to the situations before them, and trial courts are always guided by the best interests of the child. *Burger v. Smith*, 243 N.C. App. 233, 239, 776 S.E.2d 886, 891 (2015). To that end, a trial court has the discretion to prohibit the exercise of visitation rights by a non-custodial parent in the presence of a specified person if the evidence demonstrates that exposure to the prohibited person would adversely affect the child. *See Harris v. Harris*, 56 N.C. App. 122, 125, 286 S.E.2d 859, 860 (1982); *cf. Mongerson v. Mongerson*, 285 Ga. 554, 555-56, 678 S.E.2d 891, 894 (2009).

¶ 52　　Here, there was ample competent evidence that exposure to and contact with Chip adversely affected Josie's welfare. Accordingly, the trial court did not abuse its discretion and this argument is overruled.

### III.　　Conclusion

¶ 53　　For the reasons stated above, we affirm the orders of the trial court.

AFFIRMED.

Judges DILLON and WOOD concur.