IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-934

Filed 15 August 2023

Craven County, No. 21 JT 71

IN THE MATTER OF:

A.N.B.

Appeal by respondent-father from order entered 5 August 2022 by Judge Paul J. Delamar in District Court, Craven County. Heard in the Court of Appeals 17 July 2023.

*W. Michael Spivey for appellant-respondent-father.*

*Peacock Family Law, by Carolyn T. Peacock, for appellee-petitioner-mother.*

*No brief for appellee guardian ad litem.*

STROUD, Chief Judge.

Respondent-father appeals from an order terminating his parental rights to his minor child, asserting the trial court erred by failing to appoint an attorney for the minor child and failing to make sufficient findings of fact to support its conclusions. We decline to review Respondent-father's first argument because he failed to preserve it by raising it before the trial court. Further, because the trial court's findings of fact were sufficient to support its conclusions of law, we affirm.

## I. Background

Alice[1] was born to Respondent-father and Petitioner-mother in January 2015 while Father and Mother were both residents of New Hanover County. Father and Mother were never married. Shortly after Alice's birth, Mother started a Chapter 50 custody proceeding in New Hanover County.[2] In or about October 2015, the District Court, New Hanover County, entered a consent order ("2015 Custody Order") granting Mother primary physical custody of Alice. Mother and Father were granted joint legal custody of Alice and Father was granted visitation.[3]

About two years later, in December 2017, Father "was arrested for Driving While Impaired and Misdemeanor Child Abuse." Father and his brother were found passed out from a heroin overdose in a car, stopped at a red light, with Alice and her half-sibling in the back seat without any child seats or restraints. Bystanders called emergency services to assist and emergency responders had to break the window of Father's vehicle to help Father, his brother, and the two children. Father and his brother were revived with Narcan and survived the incident. The New Hanover County Department of Social Services ("DSS") contacted Mother and Mother was reunited with Alice at the scene of the incident. Because of Father's overdose, DSS later substantiated neglect against Father in February 2018 and sent Mother a letter

---

[1] We use the pseudonym for the juvenile stipulated to by the parties.

[2] The record indicates Mother initiated the custody proceeding, but the record is unclear on when Mother filed a complaint in the custody action.

[3] The date on the file stamp of the 2015 Custody Order is illegible but it was signed 7 October 2015.

stating "[t]here was sufficient information found during the Investigative Assessment [into the December 2017 incident] to Substantiate . . . [n]eglect in the form of Injurious Environment against [Father]." DSS recommended all contact between Father and Alice be supervised until Father could make "significant progress" on his sobriety and left supervision arrangements to Mother's discretion.

Mother then filed a motion in District Court, New Hanover County, to modify the 2015 Custody Order. Father did not appear at the May 2018 hearing on the motion to modify because he was incarcerated, and although he "was provided with information on how to writ himself to court" for the modification hearing, he had "chosen not to do so." The district court entered an order on 14 May 2018 ("2018 Custody Order") granting Mother's motion and awarding Mother sole legal and physical custody of Alice. Mother also got married in May 2018.

In June 2018, Father filed a Rule 60 motion for relief from the 2018 Custody Order. Father's motion was heard in December 2018. In January 2019,[4] the district court entered an order granting Father's motion, determining it was in Alice's "best interest . . . for each parent to participate in custody hearings," and ordering a new trial.

On 29 August 2019, the district court entered a consent order allowing Alice's paternal Grandparents to intervene in the custody proceeding. A subsequent consent

---

[4] The file stamp on this order is illegible, but the order was signed 4 January 2019.

order regarding custody was filed 11 March 2020 ("2020 Custody Order"). The 2020 Custody Order found:

> 22. [Mother] is fit and proper to exercise temporary sole custody.
>
> 23. [Father] is not fit and proper to exercise secondary custody by visitation as [Father] has issues regarding his sobriety, recent relapse, and pending criminal charges.
>
> 24. The [paternal grandparents] are fit and proper persons to have visitation with [Alice] and it is in the best interests and welfare of [Alice] that [her paternal grandparents] be granted liberal visitation with [Alice].

Mother was granted sole custody of Alice and Grandparents were granted visitation. Father was "restricted from all visitations set forth [in the 2020 Custody Order], unless the parties mutually agree[d] otherwise." Mother, Father, and Grandparents all consented to entry of the 2020 Custody Order. Later, in November 2020, venue for the Chapter 50 custody proceeding was transferred to Craven County. Due to restrictions imposed because of the COVID-19 pandemic, Grandparents did not start their visitation with Alice until December 2020.

On 6 July 2021, Mother filed a petition in Craven County to terminate Father's parental rights ("Petition"). Mother alleged two grounds for termination of Father's parental rights: (1) Father willfully abandoned Alice for the six months preceding the Petition, and (2) Father had "willfully failed and refused to pay child support" as

ordered by the District Court, New Hanover County, in a prior child support action.[5] Father filed a response on 14 September 2021, generally denying the allegations of the Petition.

On 19 November 2021, the trial court entered a pre-trial order concluding an appointment of a guardian *ad litem* ("GAL") was appropriate and appointing the public defender's office as Alice's GAL. Pursuant to local rules the public defender's office delegated the GAL duties to Mr. Barnhill, a licensed attorney. The trial court calendared Mother's Petition for hearing on 13 July 2022.

Mr. Barnhill completed an investigation and prepared a GAL court report in May 2022.[6] The GAL court report found Father had never sought review of the 2020 Custody Order, although the 2020 Custody Order was intended to be temporary. The GAL court report also found "Respondent Father admitted last seeing [Alice] on . . . December 21, 2017, when [Respondent Father] as driver, along with his brother, passed out in traffic while transporting his two children." The GAL court report found Alice had lived with Mother and her husband since Alice was three months old, Alice had "a loving and bonded relationship" with her younger half-sibling born of Mother and her husband, and it was Mother's husband's intention to adopt Alice and raise her as his own.

---

[5] Documents from the child support proceeding were not included in the record on appeal.

[6] The GAL court report is not file stamped but was signed 12 May 2022.

The GAL court report initially noted "that the . . . issue of grounds for termination [of Father's parental rights] [was] beyond the scope of [Mr. Barnhill's] task. If not, Respondent Father's self-inflicted absence from [Alice] for five years serves as a substantial ground." The GAL court report also found, consistent with other evidence in the record, that Father had in fact paid child support but due to a computer error by Child Support Enforcement, Mother had not received these payments. Ultimately, the GAL court report recommended termination of Father's parental rights due to his absence and because Mother's husband was about to be deployed overseas for an extended period for military service, and "[h]e should be able to take the family he has committed to without the interference of someone whose right to do so is based entirely on biology."

Mother's Petition was heard 13 July 2022 and 15 July 2022. The hearing was bifurcated into adjudication and disposition phases; the parties first addressed the grounds for termination of Father's parental rights then addressed Alice's best interests. During the adjudicatory phase, Mother testified that she had never been served with any notices or documents requesting a review of the 2020 Custody Order granting her sole custody and denying Father visitation. Mother also testified that Father had never tried to call her, text her, or email her regarding Alice, and Father had never sent Alice any gifts. Mother presented as evidence a timeline from May 2020 to July 2022, including her records of all communications with Father. The timeline contains three communications preceding the filing of the Petition:

- **25 June 2021:** Mother asked for Father's phone number from Alice's Grandparents. Mother texted Father and they met face-to-face over Zoom. Mother asked Father whether he would consent to Mother's husband adopting Alice and Father refused.

- **28 June 2021:** Mother texted Father after Father asked for contact with Mother through Alice's paternal grandmother. Father asked Mother whether he needed to "go through the courts to see [Alice] or if he would work with" Mother. Mother told Father they would discuss visitation more on a scheduled Zoom call on 1 July 2021.

- **1 July 2021:** Mother, her husband, and Father met on Zoom. The parties agreed that Mother and Father would stay in contact so that Father could show he had improved his life since the 2017 incident. The parties created a group text chat with Mother, her husband, and Father to keep in contact. Mother then sent a photo to Father through the group chat of Alice's "responsibility chart" and Father responded with a single message. The record does not show the content of this message.

Mother then filed the Petition after these communications transpired. Mother testified that these messages were the only communications between her and Father in the six months preceding her filing of the Petition. Mother then testified regarding post-Petition communications between her and Father. There were few communications between the parties, and Father missed the only two Zoom calls the parties scheduled.

Father's attorney cross-examined Mother and called Alice's Grandparents to testify. The testimony elicited at the termination hearing by Father's attorney largely addressed Grandparents' visitation with Alice, which is not relevant to this

appeal.[7]   Relevant to the grounds for termination, Father's attorney attempted to show that Father tried to visit with Alice but Mother had obstructed Father's attempts to communicate with Alice.   Grandfather testified about a meeting at Mother's attorney's office where Mother set rules for visitation, which Grandfather recalled as:

> Rule number one, we could not speak [Father's] name when we came to her house.  His name was not to be spoken. Rule number two, no one could have [Mother's] phone number, not even myself.  The only one that could have the phone number was [Grandmother].  And the only one that could call [Mother] was [Grandmother].

Grandfather also testified about attempts Father made to set up visitation with Alice.   Grandfather testified Father "told [Grandfather] that he had called [Mother] on several occasions and asked to speak with [Alice] or set up some kind of time" for visitation, but Mother did not allow visitation.  Grandfather testified these requests for visitation would have occurred "around 2021" because the calls occurred after the Grandparents had started visitation with Alice in December 2020, but Grandfather was not aware of any specific dates that Father tried to call Mother to coordinate a visit.

Grandfather also testified Father had "given [Grandparents] a lot of money" to buy Christmas gifts, clothes, and toys for Alice.  Grandfather estimated that about a

---

[7] During the hearing, the trial court had to repeatedly redirect the examination and witnesses' testimony back toward the grounds for termination of Father's parental rights, and away from visitation issues between the Grandparents and Alice after entry of the 2020 Custody Order.

third of Alice's gifts were generally paid for by Father and that Father had bought specific gifts for Grandfather to take and give to Alice. However, Grandfather testified he never told Mother that Father was paying for the gifts, and the only time Grandfather told Mother that Father had given Grandparents money for gifts was in June 2022, after the Petition was filed. There was no documentation admitted into evidence to prove any gifts had come from Father. Grandfather testified he did not want to identify any gifts as coming from Father because he thought Mother would stop visitation. Grandfather also testified no party attempted to file any motion to modify the 2020 Custody Order on the advice of Father's attorney because Father was waiting to resolve a pending criminal charge before seeking visitation. At the termination hearing, the trial court also stated it had reviewed the court file and confirmed no motions had been filed by any party to modify the 2020 Custody Order.

Father also testified he had been trying to visit with Alice since 2017, but Mother would not let Father directly speak with herself or Alice; Mother directed Father to contact Mother's attorney. However, Father did not identify any specific attempts he made to begin visiting with Alice. Father testified that until July 2021 he simply paid his child support and that his attempts to begin visiting Alice were made between 2018 and entry of the 2020 Custody Order.

On cross-examination, Father again confirmed that he had no documentation to show he requested visitation between entry of the 2020 Consent Order and the first Zoom call on 25 June 2021. Between March 2020 and June 2021, Father provided no

information to Mother, did not call Mother to ask for visitation, did not send emails, did not send mail, and generally made no efforts to contact Mother to see Alice.

Alice's Grandmother also testified Mother tried to prevent Father from visiting Alice. Grandmother first testified Mother established rules to limit references to Father during the Grandparents' visitation; Grandmother testified that she was not allowed to say Father's name, share Mother's new phone number, or share Mother's address. Although Father asked Grandmother for Mother's phone number and address, Grandmother did not share that information with Father. Grandmother testified Father did not have contact information for Mother until 25 June 2021, when Mother reached out for Father's contact information through the Grandparents to contact Father and ask for his consent to Alice's adoption.

Grandmother also testified Father bought gifts and gave the Grandparents money to buy gifts for Alice from 2020 through July 2021. However, Grandmother testified she had no record of any attempts by Father to contact Mother to visit Alice. Grandmother additionally testified that, to her knowledge, Father did not seek legal counsel in Craven County until after the Petition was filed.

In rebuttal, Mother testified that she did not limit Father's access to Alice. As to Mother's phone number, Mother testified "the phone number was directed to [Grandfather]. I told [Grandmother] that I would like to have communication solely through her because of previous harassment from [Grandfather], but I did not say that she could not give my phone number to [Father]." Mother also testified that she

and Grandparents did not speak about sharing her physical address. As to not referring to Father during the Grandparents' visitation with Alice, Mother testified "the boundary was to please not discuss or bring up [Father] during their visits because [Alice] had been so traumatized. And [Alice] -- the visits [were] for [Grandparents] to be with [Alice]. To be grandparents with her and just spend time with her as her grandparents."

At the close of the adjudicatory phase of the termination hearing, the trial court found "by clear, cogent, and convincing evidence that [Mother] met her burden and proved grounds" to terminate Father's parental rights for willfully abandoning Alice because "there was a period of six months . . . preceding the filing of the petition during which [Father] made no efforts to have visitation with" Alice.

The trial court then moved on to the dispositional phase. Mr. Barnhill testified during the dispositional phase of the hearing. However, because Father does not challenge the dispositional stage of the hearing on appeal, we do not discuss the specifics of Mr. Barnhill's testimony. For purposes of this appeal we simply note that Father did not object to Mr. Barnhill's role as GAL for Alice or raise any question regarding any need for separate legal representation for Alice.

On 5 August 2022, the trial court entered a written order ("Termination Order") finding grounds existed to terminate Father's parental rights:

> 43.     The Court makes the following additional Findings of Fact to support the grounds of abandonment by clear cogent and convincing evidence in this matter:

a.      The Respondent Father has had the ability to call and text [Mother] regarding [Alice] since March 11, 2020.

b.      The Respondent Father made no efforts to call [Mother] to set up visitation with [Alice] from March 11, 2020 until the Petition was filed in this matter.

c.      The Respondent Father made no efforts to text [Mother] to set up visitation with [Alice] from March 11, 2020 until the filing of the Petition in this matter.

d.      The Respondent Father did not send any text messages to [Mother] from March 11, 2020 until the filing of the Petition in this matter to make inquiries about [Alice]'s health, education or welfare.

e.      The Respondent Father did not email [Mother] and request visitation at any time from March 11, 2020 until the filing of the Petition in this matter.

f.      The Respondent Father did not email [Mother] and make inquiries as to the health, education and welfare of [Alice] from March 11, 2020 until the filing of the Petition in this matter.

g.      The Respondent Father did not send any mail to [Mother] from March 11, 2020 until the filing of the Petition in this matter requesting visitation.

h.      The Respondent Father did not send any mail to [Mother] inquiring about the health, education or welfare of [Alice] from March 11, 2020 until the filing of the Petition in this matter.

i.      The Respondent Father was represented by counsel from March 11, 2020 through November 17, 2020.  The Respondent Father did not file any pleadings with the Court requesting a review of the Temporary Order entered on March 11, 2020, by

consent which suspended all of the Respondent Father's visitation with [Alice].

j.      After the case was transferred from New Hanover County to Craven County, the Respondent Father did not file any requests for review, either *pro se* or with the assistance of an attorney, requesting a review and/or visitation with [Alice] from November 17, 2020 through the filing of the Petition in this matter.

k.      [Mother] has had absolutely no contact with the Respondent Father since March 11, 2020, until she initiated a phone call with the [Father] on June 24, 2021, requesting the [Father] sign a step-parent Consent to Adopt.

l.      The Respondent Father's parents have regularly visited with [Alice] since December 2020. They have been allowed by [Mother] to bring the Respondent Father's other child to the visitations in [Mother]'s home.  At no time did the Respondent Father's parents request [Mother] to allow the Respondent Father to have contact or visitation with [Alice] from December 2020 until the filing of the Petition in this matter.

m.      The Respondent Father's parents brought gifts to [Mother] for [Alice] for holidays and birthdays.  At no time did any of the gifts have any cards or tags signifying that the gifts were, in fact, from the Respondent Father.  Instead, the gifts were offered to [Alice] as gifts from the paternal grandparents.   However, at trial the [Father] testified that he contributed to the payment of some of these gifts, although no other evidence was offered to support this testimony, such as a card or tag on any of the gifts signifying that the gift was from anyone other than the [Grandparents].

n.      The Respondent Father has provided no gifts, cards or letters of endearment for [Alice] to [Mother]

from March 11, 2020, until the filing of the Petition in this matter.

o. The Respondent Father has made no efforts of any type, either direct or indirect, to have any contact with [Alice] from March 11, 2020 until the filing of the Petition in this matter.

p. The Respondent Father has sent no cards, gifts or any other tokens of affection for [Alice] from March 11, 2020 to the filing of the Petition in this matter.

q. The Respondent Father's last in-person contact with [Alice] was December 2017.

r. The Respondent Father was aware of [Mother]'s cell phone number, email and physical address and failed [to] act as a normal parent would in requesting contact or visitation with [Alice] at any time from March 11, 2020 until the filing of the Petition in this matter.

(Formatting altered.) The trial court then concluded it was in Alice's best interests to terminate Father's parental rights for "willfully abandon[ing] the minor child for at least six months preceding the filing of the Petition," and ordered Father's parental rights terminated as to Alice. Father appealed 26 August 2022.

On 8 November 2022, after filing his notice of appeal, Father filed a post-trial "Motion for Relief from Judgment Pursuant to Rule 60(b)" ("Rule 60 motion"). (Capitalization altered.) Father's Rule 60 motion was heard 8 December 2022. The Rule 60 motion and hearing are discussed in greater detail below when discussing Father's arguments based on this motion.

## II.    Jurisdiction

Father filed a petition for writ of certiorari ("PWC") in this Court acknowledging Father's notice of appeal was not served on Mr. Barnhill, Alice's appointed GAL. Father's PWC is verified, and Father asserts his appellate counsel discussed the appeal with Mr. Barnhill, and Mr. Barnhill was present at the hearing on Father's Rule 60 motion. Also attached to the PWC is an affidavit by Father's trial counsel attesting: (1) Father's trial counsel notified Mr. Barnhill that Father had appealed the Termination Order; (2) trial counsel was informed by Father's appellate counsel that Father's appellate counsel discussed Father's appeal with Mr. Barnhill; and (3) Mr. Barnhill was aware of and present for the hearing on Father's Rule 60 motion related to the appeal while the appeal was pending before this Court.

Father asserts failing to serve the notice of appeal on Mr. Barnhill is a non-jurisdictional defect, and Mr. Barnhill also waived any error in service by attending the Rule 60 hearing. Thus, Father filed his PWC as an alternative ground for review in case this Court deems the potential lack of service to the GAL as a jurisdictional issue. Neither Mr. Barnhill nor Mother filed a response to Father's PWC. Nor did Mr. Barnhill file an appellee brief.

Rule of Appellate Procedure 3.1 governs service of Father's notice of appeal and states in relevant part:

> Any party entitled to an appeal under N.C.G.S. § 7B-1001(a) may take appeal by filing notice of appeal with the clerk of superior court in the time and manner set out in N.C.G.S. § 7B-1001(b) and (c) and *by serving copies of the notice of appeal on all other parties*.

N.C. R. App. P. 3.1(b) (emphasis added).

We cannot locate a published case from this Court interpreting the service provision of Rule 3.1(b). However, there is a line of cases from our appellate courts holding a party's failure to serve their notice of appeal on all parties in technical compliance with Rule of Appellate Procedure 3 is a non-jurisdictional defect, and the party's noncompliance with the Rules of Appellate Procedure must instead be assessed for whether the party's noncompliance is a "substantial or gross violation of the appellate rules." *MNC Holdings, LLC v. Town of Matthews*, 223 N.C. App. 442, 445-47, 735 S.E.2d 364, 366-67 (2012) (summarizing the line of cases leading to the conclusion failure to serve notice of appeal under Rule 3 is a non-jurisdictional defect). We also note that the same rule has been applied in the criminal context, under Rule of Appellate Procedure 4. In *State v. Golder*, this Court saw no need to grant a defendant's petition for writ of *certiorari* because "[i]t is the *filing* of the notice of appeal that confers jurisdiction upon this Court, not the *service* of the notice of appeal." *State v. Golder*, 257 N.C. App. 803, 804, 809 S.E.2d 502, 504 (2018), *aff'd as modified*, 374 N.C. 238, 839 S.E.2d 782 (2020) (emphasis in original). In coming to this conclusion, this Court cited the same line of cases discussed in *MNC Holdings*. *See id.* (citing *Lee v. Winget Road, LLC*, 204 N.C. App. 96, 100, 693 S.E.2d 684, 688 (2010); *Hale v. Afro-American Arts Intern., Inc.*, 335 N.C. 231, 232, 436 S.E.2d 588, 589 (1993)).

Mr. Barnhill appears to have actual notice of Father's appeal; Mr. Barnhill has

not raised any issue before this Court regarding service of Father's notice of appeal in an appellee brief, response to Father's PWC, or motion to dismiss the appeal; and thus there is no indication in the record before us that any party would be prejudiced should we hear Father's appeal. Consistent with this Court's discussion in *MNC Holdings* regarding service under Rule of Appellate Procedure 3, and this Court's adoption of the same rule in *Golder* as to Rule of Appellate Procedure 4, we see no reason why the same standard should not apply under Rule of Appellate Procedure 3.1. We therefore conclude "that any error in service made by [Father] is non-jurisdictional and is not a substantial or gross violation of the appellate rules." *MNC Holdings*, 223 N.C. App. at 447, 735 S.E.2d at 367. We deny Father's PWC because it is superfluous.

### III. Rule 60 Motion

Father first directs us to his Rule 60 motion. Even if we generously assume Father properly made a Rule 60 motion regarding violations of North Carolina General Statute § 7B-1108, he did not preserve this argument due to his failure to object at trial regarding Mr. Barnhill's role as a GAL or the fact that Alice did not have an attorney. Indeed, Mr. Barnhill was present at the hearing on Father's motion but he did not ask to be heard and neither party asked him to testify or make a statement. "In order to preserve an issue for appellate review, a party must have presented to the trial court a timely . . . objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were

not apparent from the context." N.C. R. App. P. 10(a)(1). This Court has specifically held violations of North Carolina General Statute § 7B-1108 are not automatically preserved for appellate review. *See In re A.D.N.*, 231 N.C. App. 54, 65-66, 752 S.E.2d 201, 208-09 (2013).

Father alternatively requests we involve North Carolina Rule of Appellate Procedure 2 to hear his arguments regarding his Rule 60 motion and the trial court's noncompliance with North Carolina General Statute § 7B-1108. Rule of Appellate Procedure 2 states that "[t]o prevent manifest injustice to a party . . . either court of the appellate division may, except as otherwise expressly provided by these rules, suspend or vary the requirements or provisions of any of" the Rules of Appellate Procedure. N.C. R. App. P. 2. "Rule 2, however, must be invoked cautiously" and only in "exceptional circumstances." *Dogwood Development and Management Co., LLC v. White Oak Transport Co., Inc.*, 362 N.C. 191, 196, 657 S.E.2d 361, 364 (2008) (citation and quotation marks omitted). We conclude no "exceptional circumstances" exist in this case and decline to invoke Rule 2. Thus, we do not consider Father's arguments as to Mr. Barnhill's role as GAL.

## IV.    Termination Order

Father next challenges the trial court's findings of fact in the Termination Order and also asserts "the trial court erred by failing to make findings resolving conflicting evidence about facts relevant and material to whether Father willfully abandoned" Alice. (Capitalization altered.) Father does not challenge the

dispositional portion of the trial court's Termination Order.

## A. Standard of Review

At the adjudicatory stage, "[t]he standard of review in termination of parental rights cases is whether the findings of fact are supported by clear, cogent and convincing evidence and whether these findings, in turn, support the conclusions of law." *In re C.M.P.*, 254 N.C. App. 647, 654, 803 S.E.2d 853, 858 (2017) (citation and quotation marks omitted). "If the trial court's findings of fact are supported by ample, competent evidence, they are binding on appeal, even though there may be evidence to the contrary." *Id.* (citation and quotation marks omitted). "Unchallenged findings of fact are conclusive on appeal and binding on this Court." *Id.* (citation and quotation marks omitted). The trial court's conclusions of law are reviewed *de novo*. *Id.*

## B. Abandonment of a Juvenile

The trial court terminated Father's parental rights under North Carolina General Statute § 7B-1111(a)(7) for willfully abandoning Alice during the requisite six-month period preceding the filing of the Petition. North Carolina General Statute § 7B-1111(a)(7) provides that:

> (a) The court may terminate the parental rights upon a finding of one or more of the following:
>
> . . . .
>
> (7) The parent has willfully abandoned the juvenile for at least six consecutive months immediately preceding the filing of the petition or motion[.]

N.C. Gen. Stat. § 7B-1111(a)(7) (2021).

Our Supreme Court has further defined willful abandonment:

> In the context of a termination of parental rights proceeding, the ground of "[a]bandonment implies conduct on the part of the parent which manifests a willful determination to forego all parental duties and relinquish all parental claims to the child." *In re Young*, 346 N.C. 244, 251, 485 S.E.2d 612 (1997) (quoting *In re Adoption of Searle*, 82 N.C. App. 273, 275, 346 S.E.2d 511 (1986)). Where "a parent withholds [his] presence, [his] love, [his] care, the opportunity to display filial affection, and willfully neglects to lend support and maintenance, such parent relinquishes all parental claims and abandons the child." *Pratt v. Bishop*, 257 N.C. 486, 501, 126 S.E.2d 597, (1962). Although a parent's acts and omissions, which are at times outside of the statutorily provided period, may be relevant in assessing a parent's intent and willfulness in determining the potential existence of the ground of abandonment, the dispositive time period is the six months preceding the filing of the petition for termination of parental rights.

*In re A.A.*, 381 N.C. 325, 335, 873 S.E.2d 496, 505 (2022). "In this context, the word [']willful' encompasses more than an intention to do a thing; there must also be purpose and deliberation. Whether a biological parent has a willful intent to abandon his child is a question of fact to be determined from the evidence." *In re A.K.D.*, 227 N.C. App. 58, 61, 745 S.E.2d 7, 9 (2013) (citation and quotation marks omitted). Here, because the Petition was filed 6 July 2021, the relevant six-month period for purposes of North Carolina General Statute § 7B-1111(a)(7) was 6 January 2021 to 6 July 2021. *See* N.C. Gen. Stat. § 7B-1111(a)(7).

### 1. *Finding of Fact 43(m)*

Father specifically challenges finding 43(m), asserting the trial court only

recited Father's testimony, failed to find the credibility of the parties as to this finding, and the record evidence was insufficient to support the finding. Finding 43(m) states:

> m. The Respondent Father's parents brought gifts to [Mother] for [Alice] for holidays and birthdays. At no time did any of the gifts have any cards or tags signifying that the gifts were, in fact, from the Respondent Father. Instead, the gifts were offered to [Alice] as gifts from the paternal grandparents. *However, at trial the Respondent [Father] testified that he contributed to the payment of some of these gifts*, although no other evidence was offered to support this testimony, such as a card or tag on any of the gifts signifying that the gift was from anyone other than the [Grandparents].

(Emphasis added.) This finding is supported by competent evidence.

Mother, Father, Grandfather, and Grandmother all testified that the Grandparents brought gifts to Alice. Mother testified Father never sent gifts, but that the Grandparents "came to our house with gifts, but that's from -- that's it." Grandfather testified Father provided funds for gifts or would provide a gift for the Grandparents to take to Alice, but before the Petition he never made Mother aware any gift was from Father. Grandmother testified the Grandparents brought gifts to Alice and that Father bought some, but there was no evidence Father had actually bought the gifts or contributed to the Grandparents' gifts. Father testified that he purchased some gifts and gave money to Grandparents for gifts, but did not testify that he told Mother or Alice the gifts were from him.

Mother, Father, Grandfather, and Grandmother all also testified that the gifts

were never marked as if Father was sending the gift. Mother testified there was no indication that gifts were from Father. Grandfather testified that there was no documentary evidence, such as a tag, card, or bank record that the gift came from Father. Grandmother testified the gifts were never marked as coming from Father. Father testified that he never told Mother he had purchased the gifts.

We also note Father does not challenge finding 43(n), which states "Respondent Father has provided no gifts, cards or letters of endearment for [Alice] to [Mother] from March 11, 2020 until the filing of the Petition in this matter." This unchallenged finding is binding on appeal and establishes that Father never sent Alice gifts. *See In re C.M.P.*, 254 N.C. App. at 654, 803 S.E.2d at 858.

Finding 43(m) is supported by competent evidence. As a whole, the parties agreed the Grandparents brought gifts to Alice and these gifts were never identified as having come from Father. The gifts were always treated as if they were given by the Grandparents. Although a portion of finding 43(m) notes Father's testimony, the reference to Father's testimony is immediately followed by an actual finding of fact that "no other evidence was offered to support this testimony, such as a card or tag on any of the gifts signifying that the gift was from anyone other than the [Grandparents]." *See In re A.C.*, 378 N.C. 377, 384-85, 861 S.E.2d 858, 867-68 (2021) (discussing findings that make references to testimony and also resolve conflicts in the evidence). The trial court specifically noted the conflict in the evidence and resolved the conflict in its finding of fact. Father's challenge to finding 43(m) is

overruled.

## 2. *Finding of Fact 43(o)*

Father also challenges finding 43(o) as unsupported by competent evidence. Finding 43(o) states:

> o.      The Respondent Father has made no efforts of any type, either direct or indirect, to have any contact with the minor child from March 11, 2020 until the filing of the Petition in this matter.

But Father fails to challenge other findings of fact that would result in the same conclusion of abandonment.

The trial court's unchallenged findings show that between 11 March 2020 and 6 July 2021, including the determinative period under § 7B-1111(a)(7): (1) Father had "the ability to call and text" Mother regarding visitation with Alice but chose not to; (2) Father had the ability to email Mother regarding visitation with Alice but chose not to; (3) Father had the ability to email Mother about Alice's "health, education and welfare" but chose not to; (4) Father did not send physical mail to Mother "inquiring about the health, education or welfare" of Alice; (5) Father did not attempt to seek review or modify the 2020 Custody Order or otherwise attempt to begin visitation with Alice through judicial process; (6) Father had no contact with Mother until Mother initiated an attempt to seek his consent to a step-parent adoption; (7) the Grandparents never requested on Father's behalf that Mother allow Father to visit or have contact with Alice; (8) Father never sent gifts to Alice, although he testified

that he gave financial support for the purchase of gifts; (9) "[t]he Respondent Father's last in-person contact with [Alice] was December 2017[;]" and (10):

> [t]he Respondent Father was aware of [Mother's] cell phone number, email and physical address and failed [to] act as a normal parent would in requesting contact or visitation with the minor child at any time from March 11, 2020 until the filing of the Petition [on 6 July 2021] in this matter.

Thus, the trial court made findings that Father "was aware of the actions he could take, [and] the evidence and the findings of fact indicate that he was unwilling to take any action whatsoever to indicate that he had any interest in preserving his parental connection with" Alice. *In re J.A.J.*, 381 N.C. at 776, 874 S.E.2d at 574 (citation and quotation marks omitted). We need not consider finding 43(o) due to the numerous unchallenged and binding findings of fact that establish his abandonment of Alice.

### 3. *Lack of Findings*

Aside from the two specific challenges to the trial court's findings of fact, Father generally challenged the trial court's findings as insufficient because the trial court did not resolve every conflict in the evidence or make a finding on every piece of evidence presented, particularly as to Mother blocking his access to Alice. Father specifically asserts the trial court did not resolve the conflict in the evidence regarding Mother's "years-long effort . . . to terminate Father's parental rights during ongoing custody litigation." But, "[t]he trial court is not required to make findings of fact on all the evidence presented, nor state every option it considered." *See In re*

*J.A.A.*, 175 N.C. App. 66, 75, 623 S.E.2d 45, 51 (2005).

Here, the trial court made extensive findings of fact resolving many conflicts in the evidence. Father's main contention at the termination hearing was that Mother intentionally obstructed his access to Alice, and Mother presented evidence that Father could have taken action to contact her or establish contact with Alice but he simply failed to do so between March 2020 and July 2021. The trial court reviewed both parties' evidence and made detailed findings resolving the factual issues presented at the termination hearing, and these findings reveal the trial court ultimately concluded that Mother's version of events was more credible. "While the record contains conflicting evidence concerning the nature and extent of [Father's] attempts to contact [Alice] and the extent to which [Mother] successfully interposed obstacles to any efforts that [Father] might have made to contact his [daughter], it is not the role of this Court, rather than the trial court, to resolve such disputed factual issues" and make findings of fact on the conflicted evidence. *In re D.T.H.*, 378 N.C. 576, 585, 862 S.E.2d 651, 658 (2021). Even where there is evidence in the record to the contrary, "[i]f the trial court's findings of fact are supported by ample, competent evidence, they are binding on appeal[.]" *In re C.M.P.*, 254 N.C. App. at 654, 803 S.E.2d at 858. And here, the trial court resolved the conflicting evidence and made extensive findings on the evidence it found most credible when it found Father had made no efforts to contact Mother or Alice between 11 March 2020 and 6 July 2021.

We also note this Court and the North Carolina Supreme Court have both

rejected arguments like Father's. In *In re A.L.S.*, the respondent-mother argued she was subject to a 2016 custody order which granted the petitioners, the mother's cousin and her husband, sole custody and did not allow the mother visitation, like the 2020 Custody Order here. *See In re A.L.S.*, 374 N.C. 515, 521-22, 843 S.E.2d 89, 93-94 (2020). The mother's cousin also testified that she would actively avoid the mother and try to prevent contact between the mother and minor child. *See id.* The mother asserted "this evidence provides an alternative explanation for her own conduct that is 'inconsistent with a willful intent to abandon [the minor child].'" *Id.* at 521, 843 S.E.2d at 93.

The Supreme Court found "respondent-mother's argument unpersuasive. While there was evidence of ill will between petitioners and respondent-mother, this Court has held that a parent *will not be excused from showing interest in [the] child's welfare by whatever means available*." *Id.* at 522, 843 S.E.2d at 93-94 (emphasis in original) (citation and quotation marks omitted). Even though her cousin testified she would obstruct the mother's access to the minor child, the "[r]espondent-mother's failure to even attempt any form of contact or communication with [the minor child] gives rise to an inference that she acted willfully in abdicating her parental role, notwithstanding any personal animus between her and petitioners." *Id.* at 522, 843 S.E.2d at 94. And "[a]lthough the 2016 custody order did not give respondent-mother a right to visitation, the order in no way prohibited respondent-mother from contacting [the minor child]," again, like the 2020 Custody Order. *Id.* "Moreover, as

the trial court found, respondent-mother 'never sought to modify that custody order' in order to gain visitation rights." *Id.*; *see also In re M.D.*, 200 N.C. App. 35, 43, 682 S.E.2d 780, 785-86 (2009) (rejecting the father's argument before this Court that "the 'biggest factor' leading to his status as an absentee parent was the successful efforts of [the] [p]etitioner-[m]other, motivated by a number of factors, 'to shut him out of the children's lives[,]'" because the father had the means and ability to inquire after his children but failed to do so). As noted in *In re A.L.S.*, even if there is evidence that a petitioner has attempted to prevent the respondent from having access to the minor child, if the respondent still has some means available to contact the child or establish access, the trial court may find evidence of the respondent's willful intent to abandon the child by remaining absentee and not trying to contact the child by any means necessary. *See In re A.L.S.*, 374 N.C. at 521-22, 843 S.E.2d at 93-94; *see also In re M.D.*, 200 N.C. App. at 43, 682 S.E.2d at 785-86.

While the 2020 Custody Order prohibited Father from engaging in visitation it did not prohibit contact entirely between Father, Alice, and Mother. Father also had the option to seek modification of the 2020 Custody Order to reinstate specific visitation, but he failed to take any action to do so. The findings overall demonstrate the trial court simply found Father's argument that Mother prevented him from having any contact or access not to be credible, and Father's argument was merely an excuse for why he did not attempt to contact Mother or Alice or seek visitation with Alice within the determinative period under North Carolina General Statute §

7B-1111(a)(7).  Father's argument is overruled.

### *4. Conclusion of Law*

The trial court's findings support its conclusion that Mother "has shown by clear cogent and convincing evidence that the Respondent Father has willfully abandoned the minor child for at least six months preceding the filing of the Petition" as required by North Carolina General Statute § 7B-1111(a)(7), and that Father's rights may be terminated.  *See In re C.M.P.*, 254 N.C. App. at 654, 803 S.E.2d at 858; *see also* N.C. Gen. Stat. § 7B-1111(a)(7).

## V.    Conclusion

The Termination Order is affirmed.

AFFIRMED.

Judges ARROWOOD and FLOOD concur.